# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

CURTIS R. LEACHMAN,

     Petitioner,               Civil No. 2:16-CV-12417

                                       HONORABLE BERNARD A. FRIEDMAN

v.                               UNITED STATES DISTRICT JUDGE

THOMAS WINN,

     Respondent,

_____/

## OPINION AND ORDER DENYING THE PETITION FOR WRIT OF HABEAS CORPUS, DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY, AND DENYING LEAVE TO APPEAL *IN FORMA PAUPERIS*

     Curtis R. Leachman, ("Petitioner"), confined at the Saginaw Correctional Facility in Freeland, Michigan, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  In his application, filed *pro se*, petitioner challenges his convictions for second-degree murder, M.C.L.A. 750.317; and carrying a weapon with unlawful intent, M.C.L.A. 750.226.  For the reasons that follow, the petition for writ of habeas corpus is DENIED.

## I.  Background

     Petitioner was originally charged with first-degree murder and carrying a weapon with unlawful intent.  Following a jury trial in the Isabella County Circuit Court, petitioner was convicted of the lesser included offense of second-degree murder and guilty as charged of the weapons offense.

     This Court recites verbatim the relevant facts relied upon by the Michigan Court of Appeals, which are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1). *See Wagner v. Smith,* 581 F.3d 410, 413 (6th Cir. 2009):

# I. STATEMENT OF FACTS [1]

## A. BACKGROUND

On November 9, 2012, Leachman, then 25 years old, moved into a two-bedroom apartment in Isabella County that was leased by Valerie Sprague. The building that housed the apartment had retail space on the first floor and two apartments on the second floor. The apartments were labeled apartment A and apartment B;[2] Leachman lived in apartment A. [3] Leachman was permitted to rent the spare bedroom in that apartment because Sprague was injured and was temporarily unable to live there. Sprague instructed Leachman to keep the apartment clean, not to have any parties, and to stay out of her bedroom. Leachman, however, allowed his then-close friend, Brandon Harner, to live in the apartment with him and sleep in Sprague's bedroom.[4]

## B. NOVEMBER 23–24, 2012

On November 23, 2012, Harner arrived home in the early evening after spending time with a woman who he had been dating. Harner encountered Leachman outside, near the apartment. The two men returned to the apartment together and talked for about 25 minutes. Leachman told Harner about his plans for the evening, which included seeing a woman who Leachman had been dating. After they finished talking, Leachman left the apartment and did not return for several hours.

Once Leachman returned home, he and Harner remained in the apartment for some time. At approximately 10:00 p.m., Leachman and Harner heard a bang on the wall outside of his apartment. When Leachman checked to see what caused the noise, the hallway was empty, but a hole had been made in the wall to the left of the apartment's front door. Leachman grabbed a bucket of drywall from his apartment, walked down to apartment B, and asked its occupant, Reyes Hinojosa Jr., who was going to fix the hole. Hinojosa appeared intoxicated. The conversation between

---

[1]  The facts contained in this opinion were obtained from the trial transcripts. The trial took place between May 13, 2013 and May 23, 2013. (Footnote original).

[2]  The length of the hallway between apartment B and the edge of the stairwell near apartment A is 24–1/2 feet. (Footnote original).

[3]  Apartment A has a steel front door on a wood frame with both a lock and deadbolt. The doors of both bedrooms and the bathroom in that apartment have operable locks. There is also a fire ladder that when deployed from the window of the apartment reaches far enough for a person to get within two to six feet from the ground. Apartment A's walls were adorned with graffiti. The owner of the building, Norman Curtiss, testified that he was not certain who placed the graffiti on the walls, but he believed it was the tenant. (Footnote original).

[4]  At that time, Harner had known Leachman for approximately six years. (Footnote original).

Leachman and Hinojosa started off calm, but then escalated. There was an exchange of words, which included obscenities, and Leachman threw down the bucket of drywall. Leachman then picked up the bucket, and returned to his apartment. The interaction with Hinojosa lasted about two minutes.

Sometime after midnight on November 24, 2012, someone pounded on the door of Leachman's apartment. Leachman answered the door, seemingly upset about the banging. Hinojosa, Tyrone Stanley, and Chino Alaniz were in the hallway.[5] Taylor Gepford and Alsina Waboose were behind them. Harner remained inside of the apartment, a couple of feet from the door. The conversation between Leachman and the three men started off calm. Leachman and Stanley then began arguing. Stanley threatened to beat up Leachman, and the two men discussed where Harner's loyalty would lie if Leachman and Stanley fought. It was Harner's impression that because Leachman allowed Harner to live in the apartment, Leachman wanted Harner to side with him. Harner, however, told Stanley and Leachman that he would not choose sides because he was friends with both of them. Gepford encouraged Leachman and Stanley to fight.[6] The conversation lasted less than five minutes and ended without a physical altercation. After Leachman closed the door, he purportedly overheard Hinojosa, Stanley, and Alaniz discussing the need to get additional people to come to the building.[7] Leachman told Harner that he was not a good friend because he would not fight for him. At that time, it was obvious to Harner that Leachman wanted to fight.

Approximately 15 minutes later, Leachman told Harner that he wanted to go to Michael and Jacob Partie's house to see Leachman's brothers, Ethan and Andrew. Leachman and Harner walked to the Parties's house, which was five minutes away, but Ethan and Andrew were not there. Leachman then attempted to recruit people to come back to his apartment because he believed that he was going to get "jumped"[8].[9] Joe Babosh agreed to return to Leachman's apartment, so Leachman, Harner, and Babosh walked back.

Harner wanted to remove himself and Babosh from the situation and discourage

---

[5] At that time, Harner and Stanley had been close friends for approximately four years. (Footnote original).

[6] Gepford videotaped this encounter. (Footnote original).

[7] Other people associated with apartment B included Georgia Ramirez and Janae Hunt. (Footnote original).

[8] According to the trial testimony, when a person is "jumped" it means that he or she is outnumbered by his or her opponents. (Footnote original).

[9] Leachman told law enforcement that he returned to his apartment from the Parties's house on that occasion in order to protect Sprague's property. (Footnote original).

Leachman from pursuing a fight. As such, once they returned to the apartment, Harner lied to Babosh and told him that there were eight people interested in fighting Leachman. [10] Around 4:00 a.m., Babosh heard yelling and banging on the walls outside of Leachman's apartment. As a result, Babosh called Caleb Donley to pick him and Harner up. Donley arrived at Leachman's apartment shortly thereafter with Nicole Coan, Karena Tucker, and Stephanie Alwood. Donley and Alwood entered apartment A, and greeted Leachman, Harner, and Babosh. Alwood then went and spoke with Stanley who was standing outside of the door to apartment B. Donley stayed in apartment A and teased Leachman, Harner, and Babosh for hiding in the apartment. [11] Donley then joined Coan, Tucker, and Alwood, outside of apartment B and spoke with Stanley. Donley had been concerned that Leachman was going to get "jumped," but Stanley told him that he intended to fight Leachman one-on-one.

Over the course of the evening, people became aware of the possibility that Stanley and Leachman may fight, so there were many people congregating in the hallway between apartments A and B. Leachman eventually exited his apartment and he and Stanley began exchanging words from opposite ends of the hall. The situation began to escalate, so Harner briefly went to speak with Stanley, who was near apartment B, in an effort to alleviate the tension. The exchange of negative words continued between Leachman and Stanley; Stanley being more verbal than Leachman. According to Leachman, Stanley then removed a gun that he had in his waistband and handed it to Hinojosa, who pointed it at Leachman. [12] Stanley joked with Alaniz that he needed a belt to use on Leachman, so Alaniz handed Stanley his belt. [13] Leachman then went inside of apartment A, purportedly to retrieve a knife for his protection. It was the impression of several witnesses that the confrontation was over at that time.

Within a minute, Leachman exited apartment A, passed the stairwell, and headed

---

[10] At 3:07 a.m., Leachman called Levi Doolittle and reported that seven or eight men were pounding on his door and wanted to fight him. Leachman asked Doolittle to come help because Leachman only had a couple of "girls" to help protect him. Doolittle suggested that Leachman call the police, but Leachman told him that was not an option. (Footnote original).

[11] Donley testified that when he greeted Leachman, Leachman was wearing gloves. Kahlil Richardson testified that the week before the incident Leachman referred to black baseball gloves that he was wearing as his "assassin" gloves. Testimony was elicited at trial that the gloves that Leachman was wearing on the night of the incident were similar in appearance to the gloves described by Richardson. (Footnote original).

[12] While there was testimony that Stanley had possessed an air soft gun in the past and an air soft gun was recovered from the scene, none of the witnesses corroborated Leachman's statement to law enforcement that a gun was pointed at him on the day of the incident before Stanley was stabbed. (Footnote original).

[13] A belt belonging to Alaniz was recovered by police from the floor of Hinojosa's apartment with blood on it. Alaniz testified that he was wearing the belt the last that he recalled. (Footnote original).

toward Stanley, who was by the door of apartment B. Leachman stopped approximately eight feet from Stanley and continued arguing with him. Stanley then approached Leachman and they continued to exchange words. Then Stanley (with a belt in hand), and Leachman (holding a knife) simultaneously advanced toward each other. Leachman then stabbed Stanley in his left armpit region, and also inflicted minor knife wounds to Stanley's left shoulder and left cheek. [14] Leachman reported to law enforcement that he only used light force when he stabbed Stanley in the armpit and believed that he penetrated Stanley's skin an inch to an inch and a quarter. However, the forensic pathologist who performed the autopsy testified that the wound to Stanley's armpit was over four inches deep.

After the stabbing, Leachman returned to apartment A with the bloody knife in hand. Stanley returned to apartment B and collapsed outside of the bathroom. Waboose called 911 at approximately 4:21 a.m. about 10 minutes after the stabbing. [15] Alaniz and Gepford applied pressure to Stanley's wound until Stanley stopped breathing, which was shortly before the ambulance arrived at 4:38 a.m. [16] The knife that killed Stanley was identified as a decorative knife belonging to Sprague that was one of a pair of knives that fit together and were kept on a stand in Sprague's bedroom.

Harner, Babosh, Alwood, Coan, Tucker, and Donley immediately left the building, and Donley drove them all to the Parties's house. Leachman arrived at the Parties's house shortly thereafter looking for Harner. Many of those at the Parties's house had become aware of the stabbing, and Leachman was told that Harner did not want to speak with him. Tucker overheard Leachman say "Where are the witnesses at? I'm going to stab them." Tucker responded by shouting to no particular person that Leachman was going to kill them. Leachman was escorted out of the house, at which time he told Jacob Partie that Stanley was hitting him with a belt, and he did not know what else to do.

## C. INVESTIGATION

After leaving the Parties's house, Leachman returned to his apartment building. The police were present. Leachman was detained without incident in a patrol car for questioning, and was transported to the police department. Leachman did not identify himself as the person who stabbed Stanley, but rather was detained because

---

[14] Leachman reported to law enforcement that he intended to stab Stanley in the hip or thigh, but missed because Stanley "crouched over." Testimony was elicited at trial that Stanley was in a fighting stance, but not that he was "crouched over." (Footnote original).

[15] Defense counsel did not object to the admission of the 911 tape at trial. (Footnote original).

[16] An autopsy revealed that at the time of his death, Stanley had a blood alcohol content between .08 and .09. There was also THC and nicotine in his system. (Footnote original).

he lived in the building. While being questioned regarding what happened that evening, Leachman recommended to Officers Nathan Koutz and Dale Hawks, two of the investigating officers, that they look for a gun in apartment B. Police recovered parts of a plastic air soft gun from inside and around the building where Leachman lived. The gun had been separated into four parts and did not have an orange tip, which would alert the public that it was not a real firearm. After the incident, law enforcement also recovered a pair of gloves in front of 510 Main Street, which is situated between Leachman's apartment and the Parties's house. [17]

*People v. Leachman*, No. 317508, 2015 WL 159942, at *1–3 (Mich. Ct. App. Jan. 13, 2015).

Petitioner's conviction was affirmed on appeal. *Id., lv. Den.* Mich. 855, 864 N.W.2d 579 (2015).

Petitioner seeks a writ of habeas corpus on the following grounds:

I. Whether [Leachman's] convictions should be overturned because there was insufficient evidence at trial to prove [Leachman] guilty of the crimes?

II. Whether [Leachman's] convictions must be reversed because they are against the great weight of the evidence and involve a miscarriage of justice?

III. The trial court denied [Leachman] a fair trial and his due process rights by: not properly instructing the jury regarding the issue of curtilage; his ruling to allow opinion testimony into evidence on the aggressive nature of [Leachman] under certain circumstances; his refusal to allow funds for a psychological expert and an engineer; and failing to grant [Leachman's] motions for a directed verdict and a new trial?

IV. Whether the prosecutor's actions denied [Leachman] a fair trial and his due process rights under the Michigan and federal constitutions?

V. Whether [Leachman] received ineffective assistance of trial counsel?

VI. Whether the prosecutor's actions denied [Leachman] a fair trial and his due process rights under the Michigan and federal constitutions?

---

[17] The investigation also revealed that Leachman had two cell phones on the day of the incident and both were found in his apartment. One of the phones, which was a Motorola, was unable to make telephone calls because it was not connected to a service provider. The other phone, a Samsung, was a pre-paid cell phone that was connected to a service provider and could make telephone calls. (Footnote original).

VII. Whether [Leachman] received ineffective assistance of trial counsel? [18]

## II. Standard of Review

28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
>> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11. "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as

---

[18]  Petitioner indicates that he is unable to file a reply brief, in spite of being given several extensions of time to do so, because he is still in administrative segregation. [Dkt. # 16]. Petitioner has asked this Court to instead use the briefs that he submitted to the Michigan Court of Appeals and Michigan Supreme Court, some of which he has attached to his petition. This Court is willing to incorporate the arguments raised in petitioner's state appellate court briefs which he attached to his petition as being part of petitioner's application for writ of habeas corpus. *See e.g. Burns v. Lafler*, 328 F. Supp. 2d 711, 717, n. 2. (E.D. Mich. 2004).

'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011)(citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his or her claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington,* 562 U.S. at 103. A habeas petitioner should be denied relief as long as it is within the "realm of possibility" that fairminded jurists could find the state court decision to be reasonable. *See Woods v. Etherton,* 136 S. Ct. 1149, 1152 (2016).

### III.  Discussion

**A.  Claims # 1, 2, and 3.  The insufficiency of evidence/great weight of evidence claims.**

The Court discusses petitioner's first and second and a portion of his third claims together for judicial clarity.  In his first claim, petitioner contends that the evidence was insufficient to convict him.  In his second claim, petitioner argues that the verdict went against the great weight of the evidence.  As part of his third claim, petitioner alleges that the judge erred in denying his motion for directed verdict.

Taking petitioner's second claim first, petitioner is not entitled to relief because the claim is non-cognizable on habeas review.  A federal habeas court cannot grant habeas relief because a state conviction is against the great weight of the evidence. *Cukaj v. Warren,* 305 F. Supp. 2d 789, 796 (E.D. Mich. 2004); *Dell v. Straub,* 194 F. Supp. 2d 629, 648 (E.D. Mich. 2002); *See also Nash v. Eberlin*, 258 F. App'x. 761, 764, n. 4 (6th Cir. 2007)("a manifest-weight-of-the-evidence argument is a state-law argument")*; Artis v. Collins,* 14 F. App'x. 387 (6th Cir. 2001)(declining to grant certificate of appealability to habeas petitioner on claim that jury's verdict was against the

manifest weight of the evidence). The test for habeas relief is not whether the verdict was against the great weight of the evidence, but whether there was any evidence to support it. *Dell,* 194 F. Supp. 2d at 648. As long as there is sufficient evidence to convict the petitioner, the fact that the verdict went against the great weight of the evidence does not entitle him to habeas relief. *Id.* Petitioner is not entitled to relief on his second claim.

In his first claim, petitioner argues that there was insufficient evidence to convict him of second-degree murder because there was insufficient evidence that he acted with malice aforethought and because the prosecutor failed to disprove his self-defense claim.

It is beyond question that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship,* 397 U.S. 358, 364 (1970). But the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is, "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979). This inquiry, however, does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* at 318-19 (internal citation and footnote omitted)(emphasis in the original).

More importantly, a federal habeas court may not overturn a state court decision that rejects a sufficiency of the evidence claim simply because the federal court disagrees with the state court's resolution of that claim. Instead, a federal court may grant habeas relief only if the state court decision was an objectively unreasonable application of the *Jackson* standard. *See Cavazos v.*

*Smith,* 565 U.S. 1, 2 (2011). "Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." *Id.* Indeed, for a federal habeas court reviewing a state court conviction, "the only question under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 132 S. Ct. 2060, 2065 (2012).

Finally, on habeas review, a federal court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor was observed at trial. *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983). It is the province of the factfinder to weigh the probative value of the evidence and resolve any conflicts in testimony. *Neal v. Morris*, 972 F.2d 675, 679 (6th Cir. 1992). A habeas court therefore must defer to the fact finder for its assessment of the credibility of witnesses. *Matthews v. Abramajtys*, 319 F. 3d 780, 788 (6th Cir. 2003).

Petitioner initially contends that there was insufficient evidence of malice to support his second-degree murder conviction. The Michigan Court of Appeals rejected the claim, finding that the evidence that the victim had been killed by petitioner "after being purposefully stabbed with a knife" was sufficient to establish that petitioner acted with malice so as to support his second-degree murder conviction. *Leachman*, 2015 WL 159942, at * 4.

Under Michigan law, the elements of second-degree murder are: (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse. *See Stewart v. Wolfenbarger*, 595 F.3d 647, 654 (6th Cir. 2010)(citing *People v. Goecke*, 457 Mich. 442 463-64; 579 N.W.2d 868 (1998)). "[M]alice is defined as the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and wilful disregard of the likelihood that the natural

tendency of such behavior is to cause death or great bodily harm." *Id.* (citing *People v. Aaron*, 409 Mich. 672, 728; 299 N.W.2d 304 (1980)). Additionally, "[t]he offense of second-degree murder 'does not require an actual intent to harm or kill, but only the intent to do an act that is in obvious disregard of life-endangering consequences.'" *Stewart,* 595 F.3d at 658 (quoting *People v. Aldrich*, 246 Mich.App. 101, 123; 631 N.W.2d 67 (2001)). "Malice may be inferred from defendant's use of a knife." *People v. Roper*, 286 Mich. App. 77, 85, 777 N.W.2d 483 (2009). Petitioner's intentional use of a knife to stab the victim was sufficient evidence from which the jury could have inferred that petitioner acted with malice. The Michigan Court of Appeals' rejection of his claim was reasonable.

Petitioner's primary contention is that the prosecutor failed to disprove his claim of self-defense.

Petitioner's claim is non-cognizable on habeas review. Under Michigan law, self-defense is an affirmative defense. *See People v. Dupree,* 486 Mich. 693, 704, 712; 788 N.W. 2d 399 (2010). "An affirmative defense, like self-defense, 'admits the crime but seeks to excuse or justify its commission. It does not negate specific elements of the crime.'" *People v. Reese*, 491 Mich. 127, 155, n. 76; 815 N.W.2d 85 (2012)(quoting *Dupree,* 486 Mich. at 704, n. 11). Although under Michigan law the prosecutor is required to disprove a claim of self-defense, *See People v. Watts*, 61 Mich. App. 309, 311, 232 N.W.2d 396, 398 (1975), "[p]roof of the nonexistence of all affirmative defenses has never been constitutionally required...." *See Smith v. United States,* 133 S. Ct. 714, 719 (2013)(quoting *Patterson v. New York*, 432 U.S. 197, 210 (1977)). The Supreme Court and the Court of Appeals for the Sixth Circuit have rejected the argument that the Constitution requires the prosecution to disprove self-defense beyond a reasonable doubt. *See*

*Gilmore v. Taylor*, 508 U.S. 333, 359 (1993)(Blackmun, J., dissenting)("In those States in which self-defense is an affirmative defense to murder, the Constitution does not require that the prosecution disprove self-defense beyond a reasonable doubt"); *Martin v. Ohio*, 480 U.S. 228, 233-36 (1987); *see also Allen v. Redman*, 858 F.2d 1194, 1197 (6th Cir.1988)(explaining that habeas review of sufficiency-of-the-evidence claims is limited to elements of the crimes as defined by state law and citing *Engle v. Isaac*, 456 U.S. 107 (1982), and *Duffy v. Foltz*, 804 F.2d 50 (6th Cir. 1986)). Therefore, "the due process 'sufficient evidence' guarantee does not implicate affirmative defenses, because proof supportive of an affirmative defense cannot detract from proof beyond a reasonable doubt that the accused had committed the requisite elements of the crime." *Caldwell v. Russell,* 181 F.3d 731, 740 (6th Cir. 1999). Petitioner's claim that the prosecutor failed to disprove his affirmative defense is non-cognizable on habeas review. *Id.; Allen v. Redman,* 858 F. 2d at 1200.

Moreover, even if this Court were to determine that petitioner's claim was cognizable, he would not be entitled to habeas relief. The Michigan Court of Appeals rejected petitioner's claim:

> Here, based on the trial testimony, before the stabbing, there was a hole made in the wall outside Leachman's apartment by an unknown individual; Stanley came to Leachman's house and indicated that he wanted to fight him; and there were subsequent instances of banging on the wall outside of Leachman's apartment. While there was also testimony elicited at trial that Leachman reported to law enforcement after the incident that Stanley threatened to beat Leachman to death with a belt and also pointed a gun at him before the stabbing occurred, that information was not corroborated by any of the lay witnesses who testified. Rather, the lay witnesses testified that before the stabbing and after seeing Stanley with a belt, Leachman returned to the safety of his apartment. Instead of choosing to call the police or exit the building using either the fire ladder in his apartment or the stairs, which were unobstructed, Leachman retrieved a knife, exited his apartment, and approached Stanley in the hallway between apartments A and B. This Court will not "interfere with the jury's role of determining the weight of the evidence or the credibility of witnesses." Therefore, there was sufficient evidence for the jury to find beyond a reasonable doubt that Leachman did not honestly and reasonably

believe that he was in imminent danger of death or great bodily harm warranting his use of deadly force, and was instead guilty of second-degree murder.

Leachman also argues that he had no duty to retreat. While a person has no duty to retreat from his home or the curtilage of such home, the record evidence supports that Leachman left his home and arguably the curtilage of that home in order to stab Stanley. Therefore, even considering that Leachman had no duty to retreat, sufficient evidence still exists to support his conviction of second-degree murder.

*People v. Leachman*, 2015 WL 159942, at * 4–5 (internal footnotes omitted).

Under Michigan law, one acts lawfully in self-defense if he or she honestly and reasonably believes that he or she is in danger of serious bodily harm or death, as judged by the circumstances as they appeared to the defendant at the time of the act. *Blanton v. Elo*, 186 F. 3d 712, 713, n. 1 (6th Cir. 1999)(citing *People v. Heflin*, 434 Mich. 482; 456 N.W. 2d 10 (1990)). To be lawful self-defense, the evidence must show that: (1) the defendant honestly and reasonably believed that he or she was in danger; (2) the danger feared was death or serious bodily harm or imminent forcible sexual penetration; (3) the action taken appeared at the time to be immediately necessary; and (4) the defendant was not the initial aggressor. *See Johnigan v. Elo,* 207 F. Supp. 2d 599, 608-09 (E.D. Mich. 2002)(citing *People v. Barker*, 437 Mich. 161, 165; 468 N.W. 2d 492 (1991); *People v. Kemp*, 202 Mich. App. 318, 322; 508 N.W.2d 184 (1993); *People v. Deason*, 148 Mich. App. 27, 31; 384 N.W.2d 72 (1985)). Under Michigan law, a defendant is not entitled to use any more force than is necessary to defend himself or herself. *Johnigan,* 207 F. Supp. 2d at 609 (citing *Kemp*, 202 Mich. App. at 322). "[T]he law of self-defense is based on necessity, and a killing or use of potentially lethal force will be condoned only when the killing or use of potentially lethal force was the only escape from death, serious bodily harm, or imminent forcible sexual penetration under the circumstances." *Johnigan,* 207 F. Supp. 2d at 609 (internal citation omitted).

In the present case, although there may have been evidence presented to support petitioner's

claim of self-defense, the prosecution also presented evidence from which a rational trier of fact could have concluded beyond a reasonable doubt that the prosecutor had rebutted petitioner's self-defense claim. Prosecution witnesses testified that after the initial confrontation between the victim and petitioner, petitioner retreated to the safety of his apartment. Rather than calling the police or attempting to escape the building either by using the fire ladder in his apartment or the stairs, which were unobstructed, petitioner obtained a knife, left the safety of his apartment, and confronted the victim in the hall, before stabbing him. This evidence, if believed, rebutted petitioner's self-defense claim because it established that petitioner did not honestly and reasonably believe that his life was in danger when he went returned to his apartment, before exiting with the knife and stabbing the victim. *See e.g. Johnigan v. Elo,* 207 F. Supp. 2d at 609 (evidence sufficient to negate petitioner's self-defense claim when petitioner returned to his apartment after initial confrontation with victim before coming back thirty minutes later and shooting the victim in the back while he was getting his mail). Although petitioner claims that he had no duty to retreat because the hallway was part of the curtilage of his apartment, even if petitioner had no duty to retreat, there was still sufficient evidence to negate his claim of self-defense by virtue of the fact that he acted unreasonably in this situation. *See e.g. People v. Oster*, 97 Mich. App. 122, 134–35, 294 N.W.2d 253 (1980). Petitioner's self-defense claim is finally rebutted by the fact that he did not remain at the apartment to seek medical assistance for the victim but instead actually went searching for the witnesses at another house, where he made threats to kill them.

Although there may have been some evidence to support petitioner's self-defense claim and petitioner has given interpretations to the evidence that differ from the state court's interpretation of the evidence, "in light of the deference to be accorded to state-court factfinding under § 2254(e),

as well as the traditional deference accorded to the jury's resolution of disputed factual issues," petitioner is unable to show that the Michigan Court of Appeals' unreasonably determined that the prosecutor disproved petitioner's self-defense claim. *See Seymour v. Walker,* 224 F.3d 542, 552 (6th Cir. 2000). Petitioner is not entitled to relief on his first claim.

As part of his third claim, petitioner argues that the trial judge erred in failing to direct a verdict of acquittal.

To the extent that petitioner argues that the judge should have directed a verdict on the original first-degree premeditated murder charge, petitioner was convicted of the lesser included offense of second-degree murder.

"[C]learly established Supreme Court law provides that a defendant has a right not to be *convicted* except upon proof of every element of a crime beyond a reasonable doubt; the Supreme Court has never held that the submission of a charge, upon which there is insufficient evidence, violates a defendant's constitutional rights where the defendant is acquitted of that charge." *Long v. Stovall*, 450 F. Supp. 2d 746, 752 (E.D. Mich. 2006)(quoting *Skrzycki v. Lafler*, 347 F. Supp.2d 448, 453 (E.D. Mich. 2004)(emphasis original)*; See also Aldrich v. Bock,* 327 F. Supp. 2d 743, 761-62 (E.D. Mich. 2004). A number of cases have held that the submission to a jury of a criminal charge constitutes harmless error where the habeas petitioner is acquitted of that charge. *Daniels v. Burke*, 83 F.3d 760, 765, fn. 4 (6th Cir. 1996); *Long,* 450 F. Supp. 2d at 752; *Aldrich,* 327 F. Supp. 2d at 761; *Johnson v. Hofbauer,* 159 F. Supp. 2d 582, 596 (E.D. Mich. 2001); *But see Williams v. Jones*, 231 F. Supp. 2d 586, 593-94 (E.D.Mich. 2002)(finding this claim cognizable). In light of the fact that petitioner was acquitted of the first-degree premeditated murder charge and only found guilty of the lesser included offense of second-degree murder, any error in submitting

the first-degree premeditated murder charge to the jury would not entitle petitioner to habeas relief. *See King v. Trippett*, 27 F. App'x. 506, 510 (6th Cir. 2001).

To the extent that petitioner argues that the judge should have directed a verdict on the second-degree murder charge, he would also not be entitled to relief. The state trial court's finding that the prosecution had presented sufficient evidence to submit the charge of second-degree murder to the jury, based on the evidence presented, was reasonable, and thus its denial of petitioner's motion for a directed verdict does not warrant federal habeas relief. *See Shacks v. Tessmer,* 9 F. App'x. 344, 351-52 (6th Cir. 2001). Petitioner is not entitled to habeas relief on this portion of his third claim.

## B. Claim # 3. The jury instruction claim.

Petitioner next contends that the judge failed to instruct the jurors that the hallway of the apartment complex where the stabbing took place was part of the curtilage of petitioner's apartment and thus, petitioner had no duty to retreat before exercising his right of self-defense. Under Michigan law, there is no duty for a person to retreat before using deadly force as long as that person is within his or her dwelling or within the curtilage of that dwelling. *People v. Richardson*, 490 Mich. 115, 132; 803 N.W. 2d 302 (2011)(citing to M.C.L.A. 768.21c). The judge instructed the jurors that under Michigan law, a person who is in his home or the curtilage of the home has no duty to retreat before using force to repel a deadly threat. (Tr. 5/22/13, p. 16). However, the judge refused defense counsel's request to instruct the jury that, "For purposes of this case, the hallway outside the defendant's apartment is to be considered part of his home."

The Michigan Court of Appeals rejected petitioner's claim, finding that the hallway to the apartment complex was not part of the curtilage of petitioner's apartment because other persons had

access to the hallway, thus, the petitioner was not entitled to the proposed definition of curtilage. *People v. Leachman*, No. 317508, 2015 WL 159942, at * 5.

The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack upon the constitutional validity of a state court conviction is even greater than the showing required in a direct appeal. The question in such a collateral proceeding is whether the ailing instruction so infected the entire trial that the resulting conviction violates due process, not merely whether the instruction is undesirable, erroneous, or even "universally condemned," and an omission or incomplete instruction is less likely to be prejudicial than a misstatement of the law. *Henderson v. Kibbee*, 431 U.S. 145, 154-155 (1977). Further, any ambiguity, inconsistency or deficiency in a jury instruction does not by itself necessarily constitute a due process violation. *Waddington v. Sarausad*, 555 U.S. 179, 190 (2009). It is not enough that there might be some "slight possibility" that the jury misapplied the instruction. *Id.* at 191.

Federal courts are bound by the state courts' interpretation of their own laws. *See Mullaney v. Wilbur*, 421 U.S. 684, 690-91 1975). The nature of a particular jury instruction that is given is a matter of state law, and a federal court is not at liberty to grant a writ of habeas corpus simply because the federal court finds the state court's decision was incorrect under state law. *Newton v. Million*, 349 F.3d 873, 879 (6th Cir. 2003). Because the Michigan Court of Appeals found that petitioner was not entitled under Michigan law to an instruction that the apartment hallway was part of the curtilage of his apartment, this Court must defer to that determination and cannot question it. *See Seymour v. Walker*, 224 F. 3d at 558. Petitioner is not entitled to relief on his instructional error claim.

### C. Claim # 3. The evidentiary law claim.

17

As part of his third claim, petitioner alleges that the judge erred in ruling that if petitioner admitted evidence of the victim's aggressive character, then the prosecution would be allowed to introduce evidence of petitioner's aggressive nature.

The Michigan Court of Appeals rejected petitioner's claim, concluding that M.R.E. 404 and M.R.E. 405 supported the judge's conclusion that when self-defense is an issue in a homicide case, if evidence of the victim's aggressiveness is offered by the defendant, then evidence of a trait of aggressiveness of the defendant can be admitted by the prosecutor. *People v. Leachman*, No. 2015 WL 159942, at * 6 and n. 52.

It is "not the province of a federal habeas court to reexamine state-court determinations on state-court questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). A federal court is limited in federal habeas review to deciding whether a state court conviction violates the Constitution, laws, or treaties of the United States. *Id.* Thus, errors in the application of state law, especially rulings regarding the admissibility of evidence, are usually not questioned by a federal habeas court. *Seymour v. Walker,* 224 F.3d at 552; *See also Regan v. Hoffner,* 209 F. Supp. 2d 703, 714 (E.D. Mich. 2002). Petitioner's claim that the trial court erred in interpreting the Michigan Rules of Evidence would not entitle him to relief.

### D. Claim # 3. The expert witness claim.

Petitioner next claims that the trial judge erred in denying his request for two court appointed experts. Petitioner requested funds for a psychological expert to provide an opinion regarding the stress that petitioner was experiencing at the time of the incident, so as to support petitioner's self-defense claim. Petitioner also sought the appointment of a mechanical engineer to testify regarding the amount of force needed to break down petitioner's door and whether the

victim and his friends could have done so.

The Michigan Court of Appeals rejected the claim:

Leachman requested funds for a psychological expert to provide an opinion regarding the stress that he was under on the day of the incident and what a reasonable person would do under the circumstances of this case. The trial court found that pursuant to *People v. Shadideh*, [19] it was necessary for Leachman to first file a notice of insanity, regardless of whether an insanity defense was actually asserted, so that a forensic examination could be conducted. The court indicated that an examination by an independent psychological expert could then be requested. Leachman also requested funds for a mechanical engineer to testify regarding the amount of force necessary to break down the door of Leachman's apartment, and whether Stanley and his friends could have done so. The court requested that the factual record be developed more in this regard at the preliminary examination and advised defense counsel that the issue could then be revisited.

Here, there was no abuse of discretion by the trial court in denying Leachman's request for funds for either expert because Leachman failed to show "that there [was] a material witness in his favor within the jurisdiction of the court, without whose testimony he [could not] safely proceed to trial...." Also, Leachman failed to make the requests for experts for a second time after forensic or preliminary examinations were completed, which we find constitutes a waiver of the issue on appeal. That notwithstanding, the record evidence demonstrates that Leachman was able to raise the issue of self-defense. As such, his argument that he was prevented from presenting a defense must fail.

*People v. Leachman*, No. 317508, 2015 WL 159942, at *7 (additional footnotes omitted).

The U.S. Supreme Court precedent that would most closely address petitioner's claim is *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985), where the U.S. Supreme Court held that when an indigent defendant demonstrates to a trial judge that his or her sanity at the time of the commission of the offense is to be a significant factor at trial, the state must assure a criminal defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in the evaluation, preparation, and presentation of the defense.

---

[19]   482 Mich. 1156; 758 NW2d 536 (2008)(Footnote original).

The Supreme Court, however, has never extended the rule in *Ake* to apply to the appointment of non-psychiatric experts. In *Caldwell v. Mississippi,* 472 U.S. 320, 323, n. 1 (1985), the Supreme Court indicated that given that the petitioner had offered little more than undeveloped assertions that the assistance of a criminal investigator, a fingerprint expert, and a ballistics expert would be beneficial, there was no due process deprivation by the state court judge's denial of these requests. Because the petitioner failed to make such a showing, the Supreme Court indicated that there was "no need to determine as a matter of federal constitutional law what if any showing would have entitled a defendant to assistance of the type here sought." *Id.*

A number of courts have held that a habeas petitioner was not entitled to habeas relief based on a state trial court's failure to appoint a non-psychiatric expert witness, because the Supreme Court has yet to extend *Ake* to such non-psychiatric expert witnesses. *See Morva v. Zook,* 821 F.3d 517, 524-25 (4th Cir. 2016); *cert. den.* 137 S. Ct. 1068 (2017)(Virginia Supreme Court's determination that capital murder defendant had no due process right to appointment of a prison-risk-assessment expert, in order to rebut Commonwealth's claim that defendant would be a future danger to society if life sentence was imposed, was not contrary to clearly established federal law, as would warrant habeas relief; there was no clearly established federal law requiring the appointment of a state-funded nonpsychiatric expert);*Weeks v. Angelone,* 176 F.3d 249, 264-65 (4th Cir. 1999)(habeas petitioner's entitlement to expert assistance at trial in the fields of pathology and ballistics would require the announcement of a new rule, in violation of *Teague's* antiretroactivity principle, because at the time that petitioner's conviction became final, Supreme Court precedent required only that an indigent defendant be appointed psychiatric experts when his sanity was at issue); *Jackson v. Ylst,* 921 F.2d 882, 886 (9th Cir. 1990)(habeas petitioner's claim

that his due process rights violated when he denied the appointment of an expert on eyewitness identification proposed a new rule in violation of *Teague,* and therefore could not serve as a basis for federal habeas relief); *McKenzie v. Jones,* No. 00–CV–74577–DT, 2003 WL 345835, * 3 (E.D. Mich. Jan. 29, 2003)(in light of the fact that the Supreme Court had not yet extended its holding in *Ake v. Oklahoma* to require the appointment of non-psychiatric experts to indigent criminal defendants, habeas petitioner was not entitled to a certificate of appealability, because he was unable to show that the state court's refusal to appoint an independent pathologist was contrary to, or an unreasonable application of, clearly established federal law); *Walters v. Maschner,* 151 F. Supp. 2d 1068, 1076 (N.D. Iowa 2001)(petitioner had no clearly established right to the appointment of an expert to aid in jury selection, thus, the denial of such an expert did not warrant federal habeas relief). [20]

In the present case, petitioner never filed a notice of insanity, nor did he attempt to raise an insanity defense. In particular, petitioner wished to have a psychological expert appointed to testify to petitioner's state of mind so as to support his self-defense claim. "In the realm of expert testimony, a criminal defendant is not constitutionally entitled to introduce an expert's conclusion that the criminal defendant acted in self-defense." *Tourlakis v. Morris*, 738 F. Supp. 1128, 1135 (S.D. Ohio 1990). In rejecting a similar claim as the one brought by petitioner, the Fifth Circuit noted that: "[t]he issue of self-defense comprises many considerations that are manifestly outside the area of expertise of a psychiatrist or psychologist." *Phillips v. Wainwright*, 624 F.2d 585, 590 (5th Cir. 1980). If a psychiatrist or psychologist were to testify that in his or her opinion the

---

[20] The Sixth Circuit has noted that the majority opinion in *Ake* "emphasized that its ruling was limited in cases in which the defendant's mental condition was "seriously in question" upon the defendant's "threshhold showing." *See Smith v. Mitchell,* 348 F. 3d 177, 207 (6th Cir. 2003).

defendant was acting in self-defense when he or she killed the victim, "they would be affirming not only that [the defendant] was likely to have had the requisite subjective state of mind, an opinion that their professional knowledge might well have qualified them to give, but also that [the defendant's] state of mind was reasonable, that she had taken adequate steps to avoid the danger, that it was not necessary for her to have retreated, et cetera." *Id.* The Fifth Circuit concluded that the habeas petitioner was not denied fundamental fairness by the trial court's ruling that proposed expert medical witnesses could not testify that petitioner acted in self-defense in killing her husband, because their proposed expert testimony "was clearly outside the scope of their professional expertise." *Id.*

In the present case, the trial court did not deprive petitioner of a fundamentally fair trial by failing to appoint an expert on the issue of self-defense, since this would clearly go beyond the scope of a psychologist's professional expertise. Moreover, because petitioner's state of mind regarding his self-defense claim was ascertainable to the jury without the assistance of expert testimony, petitioner has failed to show that he was deprived of a fair trial by failure to appoint an expert on the issue of self-defense. *See Socha v. Wilson,* 477 F. Supp. 2d 809, 813 (N.D. Ohio 2007).

Finally, because the Supreme Court has yet to extend *Ake* to require the appointment of non-psychiatric experts, the state court's refusal to appoint a mechanical engineer as an expert witness did not deprive petitioner of a fair trial. Petitioner is not entitled to habeas relief on his third claim.

**E. Claims # 4 and # 6. The prosecutorial misconduct claims.**

The Court discusses petitioner's fourth and sixth claims together for judicial clarity. In both claims, petitioner alleges he was denied a fair trial because of prosecutorial misconduct.

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004)(citing *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)). A prosecutor's improper comments will be held to violate a criminal defendant's constitutional rights only if they "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)(quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). Prosecutorial misconduct will thus form the basis for habeas relief only if the conduct was so egregious as to render the entire trial fundamentally unfair based on the totality of the circumstances. *Donnelly v. DeChristoforo*, 416 U.S. at 643-45. In order to obtain habeas relief on a prosecutorial misconduct claim, a habeas petitioner must show that the state court's rejection of his or her prosecutorial misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Parker v. Matthews*, 567 U.S. 37, 48 (2012)(quoting *Harrington*, 562 U.S. at 103).

Petitioner first contends that the prosecutor committed misconduct during *voir dire* when he asked a juror a hypothetical question regarding how the juror would respond to the police if the juror was accused of a crime.

The use of hypothetical questions or examples during *voir dire* is permissible and does not entitle a habeas petitioner to relief. *See Hunt v. Wolfenbarger,* No. 04-10046; 2007 WL 2421551, at 11-12 (E.D. Mich. Aug. 27, 2007). Nothing in the prosecutor's hypothetical question suggested to the jurors that they should find petitioner guilty.

Petitioner next contends that the prosecutor committed misconduct by admitting the 911 call into evidence.

Petitioner has failed to show any misconduct on the prosecutor's part. 911 calls are most likely admissible under the present sense impression exception to the hearsay rule. *See e.g. People v Hendrickson*, 459 Mich 229, 234–240; 586 N.W. 2d 906 (1998). In any event, a prosecutor "does not commit misconduct by asking questions that elicit inadmissible evidence." *Key v. Rapelje,* 634 F. App'x. 141, 148 (6th Cir. 2015).

Petitioner next contends that the prosecutor committed misconduct by eliciting irrelevant evidence from several witnesses.

The Sixth Circuit has noted that there are no Supreme Court cases which support the proposition that a prosecutor's questions that simply call for answers that are inadmissible due to relevancy constitute prosecutorial misconduct that rises to the level of a federal due process violation. *See Wade v. White,* 120 F. App'x. 591, 594 (6th Cir. 2005). Therefore, the fact that the prosecutor may have attempted to elicit irrelevant evidence would not entitle him to habeas relief. *Id.* Moreover, as the Michigan Court of Appeals noted, all of the statements complained of by petitioner were relevant to the prosecution's theory of the case or to rebutting petitioner's claim of self-defense. *People v. Leachman*, 2015 WL 159942, at * 8, 9. A prosecutor does not commit misconduct by asking witnesses relevant questions. *See Slagle v. Bagley,* 457 F.3d 501, 518 (6th Cir. 2006).

Petitioner next claims that the prosecutor committed misconduct when he asked the police whether petitioner mentioned certain things during the police interrogation. Petitioner claims that this was an impermissible reference to his right to remain silent.

It is a violation of the Due Process clause of the Fourteenth Amendment for the prosecution to use a defendant's post-arrest silence after he or she has been given *Miranda* warnings to impeach

exculpatory testimony given by the defendant at trial. *Doyle v. Ohio*, 426 U.S. 610, 619 (1976). In the present case, however, petitioner did not exercise his right to remain silent but spoke with the police. A defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent, because as to the subject matter of the statements, defendant has not remained silent at all. *Anderson v. Charles,* 447 U.S. 404, 408 (1980). Because petitioner chose to voluntarily speak with the police after his *Miranda* warnings had been given, the prosecutor's questions did not impermissibly comment upon petitioner's post-arrest silence.

Petitioner next claims that the prosecutor argued facts not in evidence when he argued that the air soft gun that was recovered from the scene weighed between three and five pounds and thus could not have been hidden in the victim's clothing.

The Michigan Court of Appeals rejected petitioner's claim:

> As aptly noted by the prosecution, the four parts of the air soft gun were admitted as evidence at trial and each of the jurors were permitted to examine such evidence. As a result, information regarding the weight of the gun was in evidence, and Leachman has not shown that the prosecution's estimate regarding the weight of the gun was inaccurate

*People v. Leachman*, 2015 WL 159942, at * 8.

It is improper for a prosecutor during closing arguments to bring to the jury any purported facts which have not been introduced into evidence and which are prejudicial. *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000). However, prosecutors must be given leeway to argue reasonable inferences from the evidence. *Id.*

In the present case, there was at least some factual support on the record for the prosecutor's argument, therefore, the prosecutor's remarks did not deprive petitioner of a fair trial. *See U.S. v. Henry*, 545 F.3d 367, 377 (6th Cir. 2008).

Petitioner next argues that the prosecutor argued facts not in evidence when he mentioned that not all of the photographs from the scene were introduced at trial and while defense counsel could have admitted them, he did not.

The prosecutor in this case did not argue any facts that had not been introduced into evidence. When the prosecutor referred to these photographs, he appeared to have done so only to rebut defense counsel's implication during his closing argument that the prosecution withheld these photographs. Such comments were not improper. *See e.g. United States v. Washam*, 468 F. App'x. 568, 573–74 (6th Cir. 2012)(when viewed in context, there was nothing improper about prosecutor's opening statement informing jury that some evidence about the crime and defendant's past would not be admitted). In any event, the prosecutor's remarks were ameliorated by the trial court's instruction that the lawyers' comments and statements were not evidence. (Tr. 5/22/13, p. 5). *See Hamblin v. Mitchell,* 354 F. 3d 482, 495 (6th Cir. 2003).

Petitioner further claims that the prosecution argued facts not in evidence when he asked the following questions: (1) the question to Officer Brandon Talty regarding whether the officer knew if the air soft gun was recovered from the scene because "somebody who is fearful of retaliation from Native Americans" carried and dropped it; (2) the question to Officer Jonathan Straus regarding how easy and quick it is to take apart an air soft gun; (3) the question to Officer Jeff Browne regarding how petitioner would expect the officer to have found the gun if petitioner did not know where the gun was; and (4) the prosecution asking one of the witnesses whether they saw a gun "Be it real, toy, imaginary or, well, you wouldn't see an imaginary one, but fake?"

The Michigan Court of Appeals rejected this claim, because the prosecutor's questions were all based on reasonable inferences arising from evidence already introduced at trial. *People v.*

*Leachman*, 2015 WL 159942, at * 9.  The Michigan Court of Appeals' decision was reasonable, precluding relief.

Petitioner next claims that the prosecutor attempted to shift the burden of proof when, in his opening statement, he told the jury to consider the statements or lack of statements from petitioner.  In the present case, the prosecution's argument did not deprive petitioner of a fair trial, because any possible prejudice which might have resulted from the comment was cured by the trial court's instructions that petitioner was presumed innocent and that the prosecutor had the burden of proving him guilty beyond a reasonable doubt. (Tr. 5/22/13, p. 4). *See Scott v. Elo,* 302 F.3d 598, 603-04 (6th Cir. 2002).

Petitioner next contends that the prosecutor committed misconduct by misstating the law regarding whether petitioner had a duty to retreat and making comments which suggested that the apartment hallway was not part of the curtilage of petitioner's apartment, thus imposing upon petitioner a duty to retreat before using deadly force.  The jurors were instructed on the law regarding petitioner's duty to retreat unless he was in his apartment or the curtilage of the apartment. (Tr. 5/22/13, p. 16).

In the present case, the prosecutor did not argue that petitioner did not have a duty to retreat if he was in his home or the curtilage of his home.  The prosecutor's comments, when viewed in context, appeared to contest the idea that the hallway where the stabbing occurred was a part of the curtilage of petitioner's apartment and suggesting that if the hallway was not part of the apartment, petitioner had a duty to retreat before using deadly force.  The prosecutor's remarks about any duty to retreat were not improper because the jury was free to accept or reject the inference that the hallway was not part of petitioner's apartment and he would therefore have a duty to retreat. *See*

*Johnson v. Hofbauer,* 159 F. Supp. 2d at 603. The prosecutor's argument was not improper because it did not misstate the law regarding self-defense or the duty to retreat, thus, petitioner is not entitled to relief on this claim. *See Palmer v. Bagley*, 330 F. App'x. 92, 107 (6th Cir. 2009).

Petitioner next contends that the prosecutor committed misconduct by stating that if self-defense were shown, then petitioner would have been "justified in murdering" the victim. The prosecutor appears to have misspoken here and probably meant to say that if petitioner acted in self-defense, he would have been justified under the law in killing the victim.

Petitioner next claims that the prosecutor improperly expressed an opinion regarding witness Joe Babosh's credibility.

A prosecutor may not express a personal opinion concerning the guilt of a defendant or the credibility of trial witnesses, because such personal assurances of guilt or vouching for the veracity of witnesses by the prosecutor "exceeds the legitimate advocates' role by improperly inviting the jurors to convict the defendant on a basis other than a neutral independent assessment of the record proof." *Caldwell v. Russell*, 181 F. 3d at 737. However, a prosecutor is free to argue that the jury should arrive at a particular conclusion based upon the record evidence. *Id.* The test for improper vouching for a witness is whether the jury could reasonably believe that the prosecutor was indicating a personal belief in the witness' credibility. *United States v. Causey*, 834 F.2d 1277, 1283 (6th Cir. 1987). "[G]enerally, improper vouching involves either blunt comments, or comments that imply that the prosecutor has special knowledge of facts not in front of the jury or of the credibility and truthfulness of witnesses and their testimony." *See United States v. Francis,* 170 F.3d 546, 550 (6th Cir. 1999)(internal citations omitted). It is worth noting that the Sixth Circuit has never granted habeas relief for improper vouching. *Byrd v. Collins,* 209 F.3d at 537 and

n. 43.

The Michigan Court of Appeals rejected petitioner's claim:

> Here, the prosecution did not imply that it had special knowledge of Babosh's credibility. Rather, the prosecution asserted that based on the fact that Babosh was an uncooperative witness and his trial testimony conflicted in part with information that he provided to law enforcement, it is unclear whether his testimony was truthful. Therefore, there was no error.

*People v. Leachman*, 2015 WL 159942, at * 10.

The prosecutor's comments, when viewed in context, indicate that the prosecutor based his comments on inferences from the evidence presented in court and not upon any personal knowledge. Because the prosecutor's comments about Joe Babosh as being untruthful was based on the evidence presented in court, was only a small portion of the prosecutor's argument, and did not create the impression that the prosecutor knew of evidence not presented to the jury, the prosecutor's comments did not deprive petitioner of a fair trial. *See Cristini v. McKee*, 526 F.3d 888, 902 (6th Cir. 2008).

Petitioner next claims that the prosecutor's rebuttal argument inappropriately went beyond the scope of defense counsel's argument when he mentioned Levi Doolittle even though his name had not been mentioned by defense counsel in his closing argument.

A prosecutor's presentation of a new argument or new evidence during rebuttal is an error of state law which does not rise to the level of constitutional violation, for purposes of seeking habeas corpus relief. *See Jenner v. Class,* 79 F.3d 736, 740 (8th Cir. 1996).

Petitioner lastly contends that the cumulative effect of the prosecutor's comments and questions deprived him of a fair trial. The Sixth Circuit has noted that the United States Supreme Court "has not held that distinct constitutional claims can be cumulated to grant habeas relief."

29

*Lorraine v. Coyle,* 291 F.3d 416, 447 (6th Cir. 2002). Petitioner is not entitled to relief on his cumulative errors claim.

**F. Claims # 5 and # 7. The ineffective assistance of trial counsel claims.**

Petitioner alleges the ineffective assistance of trial counsel.

To show that he or she was denied the effective assistance of counsel under federal constitutional standards, a defendant must satisfy a two prong test. First, the defendant must demonstrate that, considering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In so doing, the defendant must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance. *Id*. In other words, petitioner must overcome the presumption that, under the circumstances, the challenged action might be sound trial strategy. *Strickland,* 466 U.S. at 689. Second, the defendant must show that such performance prejudiced his defense. *Id*. To demonstrate prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. "*Strickland*'s test for prejudice is a demanding one. 'The likelihood of a different result must be substantial, not just conceivable.'" *Storey v. Vasbinder*, 657 F.3d 372, 379 (6th Cir. 2011)(quoting *Harrington*, 562 U.S. at 112). The Supreme Court's holding in *Strickland* places the burden on the defendant who raises a claim of ineffective assistance of counsel, and not the state, to show a reasonable probability that the result of the proceeding would have been different, but for counsel's allegedly deficient performance. *See Wong v. Belmontes*, 558 U.S. 15, 27 (2009).

Petitioner first contends that trial counsel was ineffective for failing to object to the

instances of alleged prosecutorial misconduct that petitioner asserted in his fourth and sixth claims.

To show prejudice under *Strickland* for failing to object to prosecutorial misconduct, a habeas petitioner must show that but for the alleged error of his or her trial counsel in failing to object to the prosecutor's improper questions and arguments, there is a reasonable probability that the proceeding would have been different. *Hinkle v. Randle,* 271 F.3d 239, 245 (6th Cir. 2001). This Court determined that the prosecutor did not commit misconduct, thus, petitioner is unable to establish that he was prejudiced by counsel's failure to object. *See Slagle v. Bagley,* 457 F.3d at 528.

Petitioner next claims that trial counsel was ineffective during his cross-examination of Chino Alaniz because he failed to show Alaniz pictures of the air soft gun found at the crime scene or to question him about the air gun. Petitioner claims that had defense counsel confronted Mr. Alaniz with pictures of the air gun and questioned him about it, this would have corroborated petitioner's claim that the victim was armed with the air soft gun, so as to buttress petitioner's self-defense claim.

The Michigan Court of Appeals rejected petitioner's claim:

Leachman argues that trial counsel ineffectively cross-examined Alaniz when he failed to show him and question him regarding pictures of the air soft gun found at the scene. Leachman claims that if Alaniz had seen the pictures of the gun and testified that it was similar to Stanley's, then it would have corroborated Leachman's statement that Stanley had a gun on the day of the incident. The presence of the air soft gun in general, however, corroborated Leachman's statement. Additionally, Leachman has not demonstrated how Alaniz possibly identifying the gun as one similar to Stanley's, while also testifying that he did not see Stanley with a gun the day of the incident, would have resulted in his acquittal.

*People v. Leachman*, 2015 WL 159942, at * 10.

"Courts generally entrust cross-examination techniques, like other matters of trial strategy,

31

to the professional discretion of counsel." *Dell v. Straub,* 194 F. Supp. 2d at 651. "Impeachment strategy is a matter of trial tactics, and tactical decisions are not ineffective assistance of counsel simply because in retrospect better tactics may have been available." *Id.* Although other attorneys might have reached a different conclusion about the value of confronting Mr. Alaniz with pictures of the soft air gun and asking him questions about it, counsel's strategic choice not to cross-examine Mr. Alaniz was "'within the wide range of reasonable professional assistance.'" *See Moss v. Hofbauer,* 286 F.3d 851, 864 (6th Cir. 2002)(quoting *Strickland*, 466 U.S. at 689). This is particularly so in light of the fact that Mr. Alaniz did not see the victim in possession of the air soft gun on the night in question. The jury already had evidence that an air soft gun had been recovered from the crime scene. Petitioner has failed to identify how additional impeachment of Mr. Alaniz would have affected the jury's decision. Defense counsel did not perform ineffectively by not confronting Mr. Alaniz with pictures of the air soft gun, particularly when the effect of further probing was entirely speculative on petitioner's part. *See Jackson v. Bradshaw,* 681 F.3d 753, 764-65 (6th Cir. 2012).

As a related claim, petitioner argues that trial counsel was ineffective for failing to introduce into evidence an intact model of an air gun similar to the one recovered from the scene. Petitioner claims that the jury would have been able to determine the actual weight of an intact air gun to see that such a weapon was light enough for the victim to carry in his pants. A defense counsel has no obligation to present evidence or testimony that would not have exculpated the defendant. *See Millender v. Adams,* 376 F.3d 520, 527 (6th Cir. 2004)(internal quotation omitted). The jury already had the actual air gun recovered from the scene admitted into evidence. Petitioner fails to show how an additional air gun would have assisted his defense.

Petitioner next claims that trial counsel was ineffective for failing to recall Lieutenant Scott Hrcka to testify after Detective Don Sytsema had testified to show that Detective Sytsema was not as knowledgeable about fingerprinting as he claimed to be.

Lieutenant Hrcka testified that he assisted the Mount Pleasant Police with latent print analysis regarding the knife that was recovered and an entrance door to the building. (Tr. 5/17/13, p. 120). Lieutenant Hrcka testified about a chemical agent used for fingerprinting. (*Id.*, p. 129). Lieutenant Hrcka indicated that there are many reasons that fingerprints might not be recovered from an item. Lieutenant Hrcka indicated that there were different methods for obtaining fingerprints, depending on the type of surface. Lieutenant Hrcka testified that in testing an object for prints, he would need to know if the item could absorb water or not, because a fingerprint is 97-98% water. Lieutenant Hrcka further testified that he needed to know how water would react with the surface. Lieutenant Hrcka explained that since the knife was metal and plastic, he first used super glue fuming to raise up an invisible fingerprint to the human eyes to make it visible. Lieutenant Hrcka also processed the knife with black powder, because he needed to use a color that would contrast the background so he could see the image. Lieutenant Hrcka explained that because the handle on the knife was cream-colored and the blade was silver, he used black powder. Lieutenant Hrcka testified that he did not utilize other techniques because the knife was sent for DNA testing and some techniques would destroy any future DNA use. (*Id.*, pp. 132-33). Lieutenant Hrcka acknowledged that many things could affect the ability to recover fingerprints from a surface, including the temperature of the item, whether the object was being touched numerous times, or whether the person touching the item had sweat coming out of his or her pores. Lieutenant Hrcka indicated that if it was cold and the person was not sweating, he or she might not

leave a fingerprint. (*Id.*, pp. 134-35). Lieutenant Hrcka noted that he was unable to obtain identifiable prints from a handrail he tested. (*Id.*, pp. 148-49). Lieutenant Hrcka testified that he was never given an air gun for testing. (*Id.*, p. 152).

Defense counsel later confronted Detective Sytsema with the fact that he waited over a month after the incident to attempt to obtain fingerprints from the air gun. (Tr. 5/21/13, p. 106). Defense counsel specifically referenced to Lieutenant Hrcka's testimony about the different methods for fingerprinting an item and asked Detective Sytsema whether he used all three methods to obtain fingerprints. Detective Sytsema indicated that he only dusted the gun with powder. (*Id.*, pp. 106-07).

Counsel could have very well reasonably determined that Lieutenant Hrcka's testimony was still fresh in the jurors' minds, thus, counsel was not deficient in failing to recall Hrcka to testify again after Detective Sytsema had testified. *See Bell v. Cone,* 535 U.S. 685, 699-700 (2002).

Petitioner next claims that defense counsel should have asked additional questions of Officer Hawks, Officer Talty, and Mr. Hinojosa on cross-examination. The questions basically deal with prior statements Mr. Hinojosa made to the police, in which he stated that petitioner had a fat friend who has hit him on the night in question. Petitioner presumes that the friend being referred to by Mr. Hinojosa was Brandon Harner. Petitioner also indicates that Officer Hawks should have been questioned about Mr. Hinojosa's statement to him identifying the knife used by petitioner having a black handle, even though at trial Mr. Hinojosa said he never saw the stabbing. Petitioner also claims that Officer Talty should have been questioned about a statement Mr. Hinojosa gave in which he stated that petitioner came up behind the victim and asked him if he was going to snitch, because this conflicted with Mr. Hinojosa 's trial testimony that petitioner was behind a

closed door when he said this.

Petitioner failed to identify how bringing out any of these alleged inconsistencies would have assisted his defense. Defense counsel did not perform ineffectively by not cross-examining the witnesses about these subjects, particularly when the effect of further questioning is entirely speculative on petitioner's part. *See Jackson v. Bradshaw,* 681 F.3d at 764-65.

Petitioner next claims that trial counsel was ineffective for failing to obtain an expert psychological witness, even though the judge gave counsel an additional opportunity to obtain such a witness at court expense after sending petitioner to the forensic center.

A habeas petitioner's claim that trial counsel was ineffective for failing to call an expert witness cannot be based on speculation. *See Keith v. Mitchell,* 455 F. 3d 662, 672 (6th Cir. 2006). Petitioner has offered no evidence to this Court that there is a psychological expert who would have testified concerning petitioner's state of mind, so as to support his self-defense claim.

In any event, the petitioner's self-defense claim was ascertainable to the jury without the assistance of expert testimony, therefore petitioner has failed to show that he was prejudiced by counsel's failure to obtain an expert to testify on the issue of self-defense. *Cf. Socha v. Wilson,* 477 F. Supp. 2d at 813. Because the petitioner has failed to show that he was prejudiced by counsel's failure to obtain an expert to bolster his self-defense claim, the petitioner is not entitled to habeas relief. *See Langford v. Butler,* 55 F. App'x. 462, 463 (9th Cir. 2003).

Petitioner next claims that counsel was ineffective for failing to the admission of Exhibit 104. Petitioner does not offer any reasons why this exhibit was not admissible. The failure to object to relevant and admissible evidence in not ineffective assistance of counsel. *See Alder v. Burt,* 240 F. Supp. 2d 651, 673 (E.D. Mich. 2003).

35

Petitioner finally claims that this Court should grant him a new trial because his own trial counsel at the motion for a new trial admitted to being ineffective. This Court cannot use counsel's own subjective belief in his own ineffectiveness as a basis to grant relief. "After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome. *Strickland*, however, calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Harrington*, 562 U.S. at 109-10. "[S]ome excellent lawyers would stipulate to their own ineffectiveness if it might help win a client's release." *Harris v. United States*, 367 F.3d 74, 81 (2d Cir. 2004); *See also Dugas v. Coplan*, 428 F.3d 317, 328, n.10 (1st Cir. 2005)("[defense counsel's] subjective impression that his representation was inadequate plays no role in our decision."); *Jennings v. McDonough*, 490 F.3d 1230, 1247 (11th Cir. 2007)("[t]he *Strickland* standard of objective reasonableness does not depend on the subjective intentions of the attorney, judgments made in hindsight, or an attorney's admission of deficient performance"). Petitioner is not entitled to relief on his ineffective assistance of counsel claims.

## IV. Conclusion

The Court will deny the petition for writ of habeas corpus. The Court will also deny a certificate of appealability to petitioner. In order to obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*,

529 U.S. 473, 483-84 (2000). When a district court rejects a habeas petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *Id.* at 484. "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254.

For the reasons stated in this opinion, the Court will deny petitioner a certificate of appealability because petitioner has failed to make a substantial showing of the denial of a federal constitutional right. *See Dell v. Straub,* 194 F. Supp. 2d at 659. The Court will also deny petitioner leave to appeal *in forma pauperis*, because the appeal would be frivolous. *Id.*

## V. <u>ORDER</u>

Based upon the foregoing, IT IS ORDERED that the petition for a writ of habeas corpus is

**DENIED WITH PREJUDICE.**

IT IS FURTHER ORDERED That a certificate of appealability is **DENIED.**

IT IS FURTHER ORDERED that Petitioner will be **DENIED** leave to appeal *in forma pauperis.*


Dated: December 14, 2017                    s/Bernard A. Friedman
      Detroit, Michigan                    BERNARD A. FRIEDMAN
                                          SENIOR UNITED STATES DISTRICT JUDGE

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on December 14, 2017.

s/Johnetta M. Curry-Williams
Case Manager