UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CURTIS LEACHMAN, #723742,

          Petitioner,                               Civil Action No. 16-CV-12417

vs.                                          HON. BERNARD A. FRIEDMAN

THOMAS WINN,

          Respondent,
_____/

## AMENDED OPINION AND ORDER VACATING THE COURT'S DECEMBER 14, 2017, OPINION AND ORDER AND JUDGMENT, DENYING THE PETITION FOR A WRIT OF HABEAS CORPUS, DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY, AND DENYING LEAVE TO APPEAL *IN FORMA PAUPERIS*

        This matter is before the Court on petitioner Leachman's pro se petition for writ of habeas corpus filed under 28 U.S.C. § 2254. Petitioner challenges his convictions for second-degree murder, Mich. Comp. Laws § 750.317, and carrying a weapon with unlawful intent, Mich. Comp. Laws § 750.226. For the following reasons, the petition is denied.

## I.      BACKGROUND

        Petitioner was originally charged with first-degree murder and carrying a weapon with unlawful intent. Following a jury trial in the Isabella County Circuit Court, petitioner was convicted of the lesser-included offense of second-degree murder and of the charged weapons offense. This Court recites verbatim the relevant facts relied upon by the Michigan Court of Appeals, which are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1):

# I. STATEMENT OF FACTS[1]

## A. BACKGROUND

On November 9, 2012, Leachman, then 25 years old, moved into a two-bedroom apartment in Isabella County that was leased by Valerie Sprague. The building that housed the apartment had retail space on the first floor and two apartments on the second floor. The apartments were labeled apartment A and apartment B;[2] Leachman lived in apartment A.[3] Leachman was permitted to rent the spare bedroom in that apartment because Sprague was injured and was temporarily unable to live there. Sprague instructed Leachman to keep the apartment clean, not to have any parties, and to stay out of her bedroom. Leachman, however, allowed his then-close friend, Brandon Harner, to live in the apartment with him and sleep in Sprague's bedroom.[4]

## B. NOVEMBER 23–24, 2012

On November 23, 2012, Harner arrived home in the early evening after spending time with a woman who he had been dating. Harner encountered Leachman outside, near the apartment. The two men returned to the apartment together and talked for about 25 minutes. Leachman told Harner about his plans for the evening, which included seeing a woman who Leachman had been dating. After they finished talking, Leachman left the apartment and did not return for several hours.

Once Leachman returned home, he and Harner remained in the apartment for some time. At approximately 10:00 p.m., Leachman and Harner heard a bang on the wall outside of his apartment. When Leachman checked to see what caused the noise, the hallway was empty, but a hole had been made in the wall to the left of the apartment's front door. Leachman grabbed a bucket of drywall from his apartment, walked down to apartment B, and asked its occupant, Reyes Hinojosa Jr., who was going to fix the hole. Hinojosa appeared intoxicated. The conversation between Leachman and

---

[1] (Footnote in original). The facts contained in this opinion were obtained from the trial transcripts. The trial took place between May 13, 2013 and May 23, 2013.

[2] (Footnote in original). The length of the hallway between apartment B and the edge of the stairwell near apartment A is 24–1/2 feet.

[3] (Footnote in original). Apartment A has a steel front door on a wood frame with both a lock and deadbolt. The doors of both bedrooms and the bathroom in that apartment have operable locks. There is also a fire ladder that when deployed from the window of the apartment reaches far enough for a person to get within two to six feet from the ground. Apartment A's walls were adorned with graffiti. The owner of the building, Norman Curtiss, testified that he was not certain who placed the graffiti on the walls, but he believed it was the tenant.

[4] (Footnote in original). At that time, Harner had known Leachman for approximately six years.

Hinojosa started off calm, but then escalated. There was an exchange of words, which included obscenities, and Leachman threw down the bucket of drywall. Leachman then picked up the bucket, and returned to his apartment. The interaction with Hinojosa lasted about two minutes.

Sometime after midnight on November 24, 2012, someone pounded on the door of Leachman's apartment. Leachman answered the door, seemingly upset about the banging. Hinojosa, Tyrone Stanley, and Chino Alaniz were in the hallway.[5] Taylor Gepford and Alsina Waboose were behind them. Harner remained inside of the apartment, a couple of feet from the door. The conversation between Leachman and the three men started off calm. Leachman and Stanley then began arguing. Stanley threatened to beat up Leachman, and the two men discussed where Harner's loyalty would lie if Leachman and Stanley fought. It was Harner's impression that because Leachman allowed Harner to live in the apartment, Leachman wanted Harner to side with him. Harner, however, told Stanley and Leachman that he would not choose sides because he was friends with both of them. Gepford encouraged Leachman and Stanley to fight.[6] The conversation lasted less than five minutes and ended without a physical altercation. After Leachman closed the door, he purportedly overheard Hinojosa, Stanley, and Alaniz discussing the need to get additional people to come to the building.[7] Leachman told Harner that he was not a good friend because he would not fight for him. At that time, it was obvious to Harner that Leachman wanted to fight.

Approximately 15 minutes later, Leachman told Harner that he wanted to go to Michael and Jacob Partie's house to see Leachman's brothers, Ethan and Andrew. Leachman and Harner walked to the Parties's house, which was five minutes away, but Ethan and Andrew were not there. Leachman then attempted to recruit people to come back to his apartment because he believed that he was going to get "jumped"[8].[9] Joe Babosh agreed to return to Leachman's apartment, so Leachman, Harner, and Babosh walked back.

Harner wanted to remove himself and Babosh from the situation and discourage Leachman from pursuing a fight. As such, once they returned to the apartment, Harner lied to Babosh and told him that

---

[5] (Footnote in original). At that time, Harner and Stanley had been close friends for approximately four years.

[6] (Footnote in original). Gepford videotaped this encounter.

[7] (Footnote in original). Other people associated with apartment B included Georgia Ramirez and Janae Hunt.

[8] (Footnote in original). According to the trial testimony, when a person is "jumped" it means that he or she is outnumbered by his or her opponents.

[9] (Footnote in original). Leachman told law enforcement that he returned to his apartment from the Parties's house on that occasion in order to protect Sprague's property.

there were eight people interested in fighting Leachman.[10] Around 4:00 a.m., Babosh heard yelling and banging on the walls outside of Leachman's apartment. As a result, Babosh called Caleb Donley to pick him and Harner up. Donley arrived at Leachman's apartment shortly thereafter with Nicole Coan, Karena Tucker, and Stephanie Alwood. Donley and Alwood entered apartment A, and greeted Leachman, Harner, and Babosh. Alwood then went and spoke with Stanley who was standing outside of the door to apartment B. Donley stayed in apartment A and teased Leachman, Harner, and Babosh for hiding in the apartment.[11] Donley then joined Coan, Tucker, and Alwood, outside of apartment B and spoke with Stanley. Donley had been concerned that Leachman was going to get "jumped," but Stanley told him that he intended to fight Leachman one-on-one.

Over the course of the evening, people became aware of the possibility that Stanley and Leachman may fight, so there were many people congregating in the hallway between apartments A and B. Leachman eventually exited his apartment and he and Stanley began exchanging words from opposite ends of the hall. The situation began to escalate, so Harner briefly went to speak with Stanley, who was near apartment B, in an effort to alleviate the tension. The exchange of negative words continued between Leachman and Stanley; Stanley being more verbal than Leachman. According to Leachman, Stanley then removed a gun that he had in his waistband and handed it to Hinojosa, who pointed it at Leachman.[12] Stanley joked with Alaniz that he needed a belt to use on Leachman, so Alaniz handed Stanley his belt.[13] Leachman then went inside of apartment A, purportedly to retrieve a knife for his protection. It was the impression of several witnesses that the confrontation was over at that time.

Within a minute, Leachman exited apartment A, passed the stairwell, and headed toward Stanley, who was by the door of apartment B. Leachman stopped approximately eight feet from

---

[10] (Footnote in original). At 3:07 a.m., Leachman called Levi Doolittle and reported that seven or eight men were pounding on his door and wanted to fight him. Leachman asked Doolittle to come help because Leachman only had a couple of "girls" to help protect him. Doolittle suggested that Leachman call the police, but Leachman told him that was not an option.

[11] (Footnote in original). Donley testified that when he greeted Leachman, Leachman was wearing gloves. Kahlil Richardson testified that the week before the incident Leachman referred to black baseball gloves that he was wearing as his "assassin" gloves. Testimony was elicited at trial that the gloves that Leachman was wearing on the night of the incident were similar in appearance to the gloves described by Richardson.

[12] (Footnote in original). While there was testimony that Stanley had possessed an air soft gun in the past and an air soft gun was recovered from the scene, none of the witnesses corroborated Leachman's statement to law enforcement that a gun was pointed at him on the day of the incident before Stanley was stabbed.

[13] (Footnote in original). A belt belonging to Alaniz was recovered by police from the floor of Hinojosa's apartment with blood on it. Alaniz testified that he was wearing the belt the last that he recalled.

Stanley and continued arguing with him. Stanley then approached Leachman and they continued to exchange words. Then Stanley (with a belt in hand), and Leachman (holding a knife) simultaneously advanced toward each other. Leachman then stabbed Stanley in his left armpit region, and also inflicted minor knife wounds to Stanley's left shoulder and left cheek. [14] Leachman reported to law enforcement that he only used light force when he stabbed Stanley in the armpit and believed that he penetrated Stanley's skin an inch to an inch and a quarter. However, the forensic pathologist who performed the autopsy testified that the wound to Stanley's armpit was over four inches deep.

After the stabbing, Leachman returned to apartment A with the bloody knife in hand. Stanley returned to apartment B and collapsed outside of the bathroom. Waboose called 911 at approximately 4:21 a.m. about 10 minutes after the stabbing. [15] Alaniz and Gepford applied pressure to Stanley's wound until Stanley stopped breathing, which was shortly before the ambulance arrived at 4:38 a.m. [16] The knife that killed Stanley was identified as a decorative knife belonging to Sprague that was one of a pair of knives that fit together and were kept on a stand in Sprague's bedroom.

Harner, Babosh, Alwood, Coan, Tucker, and Donley immediately left the building, and Donley drove them all to the Parties's house. Leachman arrived at the Parties's house shortly thereafter looking for Harner. Many of those at the Parties's house had become aware of the stabbing, and Leachman was told that Harner did not want to speak with him. Tucker overheard Leachman say "Where are the witnesses at? I'm going to stab them." Tucker responded by shouting to no particular person that Leachman was going to kill them. Leachman was escorted out of the house, at which time he told Jacob Partie that Stanley was hitting him with a belt, and he did not know what else to do.

## C. INVESTIGATION

After leaving the Parties's house, Leachman returned to his apartment building. The police were present. Leachman was detained without incident in a patrol car for questioning, and was transported to the police department. Leachman did not identify

---

[14] (Footnote in original). Leachman reported to law enforcement that he intended to stab Stanley in the hip or thigh, but missed because Stanley "crouched over." Testimony was elicited at trial that Stanley was in a fighting stance, but not that he was "crouched over."

[15] (Footnote in original). Defense counsel did not object to the admission of the 911 tape at trial.

[16] (Footnote in original). An autopsy revealed that at the time of his death, Stanley had a blood alcohol content between .08 and .09. There was also THC and nicotine in his system.

himself as the person who stabbed Stanley, but rather was detained because he lived in the building. While being questioned regarding what happened that evening, Leachman recommended to Officers Nathan Koutz and Dale Hawks, two of the investigating officers, that they look for a gun in apartment B. Police recovered parts of a plastic air soft gun from inside and around the building where Leachman lived. The gun had been separated into four parts and did not have an orange tip, which would alert the public that it was not a real firearm. After the incident, law enforcement also recovered a pair of gloves in front of 510 Main Street, which is situated between Leachman's apartment and the Parties's house.[17]

*People v. Leachman*, No. 317508, 2015 WL 159942, at *1–3 (Mich. Ct. App. Jan. 13, 2015). The Michigan Supreme Court affirmed petitioner's conviction in June 2015. *People v. Leachman*, 864 N.W.2d 579 (2015).

Petitioner seeks a writ of habeas corpus on the following grounds:

I. Whether [Leachman's] convictions should be overturned because there was insufficient evidence at trial to prove [Leachman] guilty of the crimes?

II. Whether [Leachman's] convictions must be reversed because they are against the great weight of the evidence and involve a miscarriage of justice?

III. The trial court denied [Leachman] a fair trial and his due process rights by: not properly instructing the jury regarding the issue of curtilage; his ruling to allow opinion testimony into evidence on the aggressive nature of [Leachman] under certain circumstances; his refusal to allow funds for a psychological expert and an engineer; and failing to grant [Leachman's] motions for a directed verdict and a new trial?

IV. Whether the prosecutor's actions denied [Leachman] a fair trial and his due process rights under the Michigan and federal constitutions?

V. Whether [Leachman] received ineffective assistance of trial counsel?

---

[17]  (Footnote in original).  The investigation also revealed that Leachman had two cell phones on the day of the incident and both were found in his apartment. One of the phones, which was a Motorola, was unable to make telephone calls because it was not connected to a service provider. The other phone, a Samsung, was a pre-paid cell phone that was connected to a service provider and could make telephone calls.

VI. Whether the prosecutor's actions denied [Leachman] a fair trial and his due process rights under the Michigan and federal constitutions?

VII. Whether [Leachman] received ineffective assistance of trial counsel?[18]

## II.    STANDARD OF REVIEW

Under 28 U.S.C. § 2254(d)(1)–(2), the Court cannot grant a habeas petition "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or if the state-court decision "was based on an unreasonable determination of the facts in light of the" state-court evidence.

A state-court decision is contrary to "clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15–16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)).

"[T]he 'unreasonable application' prong of [the statute] permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) quoting *Williams*, 529 U.S. at 413. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists

---

[18] Petitioner states that he cannot file a reply brief because he is segregated.   He requests that the Court use the briefs he submitted to the Michigan Court of Appeals and Michigan Supreme Court, some of which he has attached to his petition.   The Court is willing to do so.   *See e.g.*, *Burns v. Lafler,* 328 F. Supp. 2d 711, 717, n.2 (E.D. Mich. 2004) (considering the petitioner's state-court arguments in lieu of complete federal-court briefing)

could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Habeas corpus review "is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Richter*, 562 U.S. at 103. To obtain habeas corpus relief, petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*

## III. DISCUSSION

### A. Claims I, II, and III: Insufficiency-of-the-Evidence and Great-Weight-of-the-Evidence Claims

In Claim I, petitioner contends that the evidence was insufficient to convict him. In Claim II, he argues that the verdict went against the great weight of the evidence. As part of Claim III, he asserts that the state court erred in denying his motion for directed verdict.

In Claim I, petitioner argues that the Court should vacate his second-degree murder conviction because there was insufficient evidence that he acted with malice aforethought and because the prosecutor failed to disprove his self-defense claim.

When deciding a sufficiency-of-the-evidence claim, the critical inquiry is "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979). So long as, "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," the Court must deny the sufficiency-of-the-evidence claim. *Id.* at 319 (emphasis in the original). The only question "is whether that finding was so insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 566 U.S.

650, 656 (2012). The Court does not reweigh evidence or reassess witness credibility, *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983), but defers to the fact finder, *Matthews v. Abramajtys*, 319 F. 3d 780, 788 (6th Cir. 2003).

The Michigan Court of Appeals rejected Claim I, finding that the evidence that the victim had been killed by petitioner "after being purposefully stabbed with a knife" was sufficient to establish that petitioner acted with malice so as to support his second-degree murder conviction. *Leachman*, 2015 WL 159942, at * 4. "The elements of second-degree murder under Michigan law are: (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse." *Stewart v. Wolfenbarger*, 595 F.3d 647, 654 (6th Cir. 2010). Malice is "the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *Id.* "Malice may be inferred from [a] defendant's use of a knife." *People v. Roper*, 777 N.W.2d 483, 490 (Mich. Ct. App. 2009).

Petitioner's intentional use of a knife to stab the victim was sufficient evidence from which the jury could have inferred that petitioner acted with malice. The Michigan Court of Appeals' rejection of his claim was reasonable.

Petitioner's also contends that the prosecutor failed to disprove his self-defense claim. In Michigan, self-defense is an affirmative defense. *See People v. Dupree,* 788 N.W. 2d 399, 405 (Mich. Ct. App. 2010). "[T]e due process 'sufficient evidence' guarantee does not implicate affirmative defenses, because proof supportive of an affirmative defense cannot detract from proof beyond a reasonable doubt that the accused had committed the requisite elements of the crime." *Caldwell v. Russell,* 181 F.3d 731, 740 (6th Cir. 1999). Thus, petitioner's claim that the prosecutor failed to disprove his affirmative defense is not cognizable.

In Claim II, petitioner argues that his conviction is against the great weight of the evidence. This claim is also not cognizable. The Court cannot grant habeas relief simply because a state-court verdict is against the great weight of the evidence. *Nash v. Eberlin*, 258 F. App'x 761, 764, n.4 (6th Cir. 2007); *see also Artis v. Collins,* 14 F. App'x 387 (6th Cir. 2001) (declining to grant certificate of appealability to habeas petitioner on claim that jury's verdict was against the manifest weight of the evidence). As long as there is sufficient evidence to convict the petitioner, that the verdict went against the great weight of the evidence does not entitle him to habeas relief. *Dell v. Straub,* 194 F. Supp. 2d 629, 648 (E.D. Mich. 2002). Petitioner is not entitled to relief on Claim II.

In Claim III, petitioner argues that the trial judge erred in failing to direct verdicts of acquittal as to the original first-degree and second-degree murder charges. Several cases have held that submitting to the jury a criminal charge of which the petitioner is acquitted is harmless error. *See, e.g.*, *Daniels v. Burke*, 83 F.3d 760, 765, n.4 (6th Cir. 1996); *Long v. Stovall,* 450 F. Supp. 2d 746, 752 (E.D. Mich. 2006); *Aldrich v. Bock*, 327 F. Supp. 2d 743, 761 (E.D. Mich. 2004). Given that the jury acquitted petitioner of first-degree murder, submitting the first-degree murder charge to the jury was, at worst, harmless error. And the state court reasonably found that the prosecution presented sufficient evidence to submit the second-degree-murder charge to the jury. *See Shacks v. Tessmer,* 9 F. App'x 344, 351–52 (6th Cir. 2001). Therefore, petitioner is not entitled to habeas relief on this portion of Claim III.

**B.  Claim III: Jury-Instruction, Evidentiary-Law, and Expert-Witness Claims**

*Jury-Instruction Claim.* Petitioner next contends that the state court failed to instruct the jury that the apartment complex's hallway was part of the curtilage of petitioner's apartment and thus, petitioner had no duty to retreat before exercising his right of self-defense. In

Michigan, a person need not retreat before using deadly force so long as he is within the curtilage of his dwelling. *People v. Richardson*, 803 N.W. 2d 302, 311 (Mich. Ct. App. 2011).

Here, the state court instructed the jury as to *Richardson*, but it refused defense counsel's request to instruct the jury that, "For purposes of this case, the hallway outside the defendant's apartment is to be considered part of his home." Trial Tr., May 22, 2013, p. 16. The Michigan Court of Appeals rejected petitioner's claim, finding that the apartment complex's hallway was not part of the curtilage of petitioner's apartment because other persons had access to the hallway. Therefore, petitioner was not entitled to his proposed definition of curtilage. *Leachman*, No. 317508, 2015 WL 159942, at *5.

Federal courts are bound by the state courts' interpretation of their own laws. *Mullaney v. Wilbur*, 421 U.S. 684, 690–91 (1975). Jury instructions are matters of state law, and a federal court may not grant a petition simply because it believes the state court's decision to be incorrect under state law. *Williams v. Taylor*, 529 U.S. 362, 411 (2000); *see also Newton v. Million*, 349 F.3d 873, 879 (6th Cir. 2003). "[I]t is not for this court to question the state court's interpretation of its own law." *See Seymour v. Walker*, 224 F. 3d 542, 558 (6th Cir. 2000). The Michigan Court of Appeals found that petitioner was not entitled under Michigan law to his requested instruction. The Court will not second guess the Michigan Court of Appeals, so petitioner's claim is denied.

> *Evidentiary-Law Claim.* Petitioner further alleges that the state court erred in ruling that if petitioner admitted evidence of the victim's aggressive character, then the prosecution would be allowed to introduce evidence of petitioner's aggressive nature. The Michigan Court of Appeals rejected petitioner's claim, relying on Mich. R. Evid. 404 and 405. *People v. Leachman*, No. 317508, 2015 WL 159942, at *6 and n.52. It is "not the province of a federal habeas court to

reexamine state-court determinations on state-court questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). A federal court is limited in habeas review to deciding whether a state court conviction violates the Constitution, laws, or treaties of the United States. *Id.* Errors in the admissibility of evidence are rarely questioned by a federal court. *Seymour*, 224 F.3d at 552. The Court will not second guess the Michigan Court of Appeals, so petitioner's claim is denied.

*Expert-Witness Claim.* Petitioner next claims that the state court erred in denying his request for two court-appointed experts: a psychologist to testify as to the stress petitioner was experiencing at the time of the murder and a mechanical engineer to testify regarding the amount of force needed to break down petitioner's door and whether the victim and his friends could have done so. Petitioner wished to offer their proposed testimony in support of his self-defense argument. The Michigan Court of Appeals rejected petitioner's claim, stating:

> Leachman requested funds for a psychological expert to provide an opinion regarding the stress that he was under on the day of the incident and what a reasonable person would do under the circumstances of this case. The trial court found that pursuant to *People v. Shadideh*, it was necessary for Leachman to first file a notice of insanity, regardless of whether an insanity defense was actually asserted, so that a forensic examination could be conducted. The court indicated that an examination by an independent psychological expert could then be requested. Leachman also requested funds for a mechanical engineer to testify regarding the amount of force necessary to break down the door of Leachman's apartment, and whether Stanley and his friends could have done so. The court requested that the factual record be developed more in this regard at the preliminary examination and advised defense counsel that the issue could then be revisited.
>
> Here, there was no abuse of discretion by the trial court in denying Leachman's request for funds for either expert because Leachman failed to show "that there [was] a material witness in his favor within the jurisdiction of the court, without whose testimony he [could not] safely proceed to trial...." Also, Leachman failed to make the requests for experts for a second time after forensic or preliminary examinations were completed, which we find constitutes a waiver of the issue on appeal. That notwithstanding, the record evidence

demonstrates that Leachman was able to raise the issue of self-defense. As such, his argument that he was prevented from presenting a defense must fail.

*People v. Leachman*, No. 317508, 2015 WL 159942, at *7 (footnotes omitted).

The Supreme Court precedent most analogous to petitioner's claim is *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985). *Ake* held that when an indigent defendant demonstrates in state court that his sanity at the time of the offense is to be significant at trial, the state must assure him access to a competent psychiatrist, who will conduct an appropriate examination and assist in the defense. *Id.* The Court, however, has never extended *Ake*'s rule to non-psychiatric experts.[19] And many lower courts have held that a petitioner is not entitled to habeas relief based on a state trial court's failure to appoint a non-psychiatric experts.[20]

Here, petitioner never filed a notice of insanity, nor did he raise an insanity defense. Both of his proposed experts are non-psychiatric experts. Because the Supreme Court has yet to extend *Ake* to require the appointment of non-psychiatric experts, the state court's refusal to appoint a mechanical engineer as an expert witness did not deprive petitioner of a fair trial. Petitioner is not entitled to habeas relief on his third claim.

---

[19] For example, in *Caldwell v. Mississippi,* 472 U.S. 320, 323, n.1 (1985), because the petitioner offered little more than undeveloped assertions that the assistance of a criminal investigator, fingerprint expert, and ballistics expert would be helpful, The Court held that the state court's denial of the petitioner's requests did not deprive him of due process.

[20] *See, e.g.*, *Morva v. Zook*, 821 F.3d 517, 524–25 (4th Cir. 2016) (holding that the Virginia Supreme Court's decision that a capital murder defendant had no due-process right to appointment of a prison-risk assessment expert was not contrary to clearly established federal law; there was no clearly established federal law requiring the appointment of a state-funded nonpsychiatric expert); *Jackson v. Ylst*, 921 F.2d 882, 886 (9th Cir. 1990) (finding a habeas petitioner's claim that his due process rights violated when he denied the appointment of an expert on eyewitness identification could not serve as a basis for federal habeas relief); *McKenzie v. Jones*, No. 00BCVB74577BDT, 2003 WL 345835, * 3 (E.D. Mich. Jan. 29, 2003) (holding that the Supreme Court had not yet extended *Ake* to require the appointment of non-psychiatric experts to indigent criminal defendants; therefore, the habeas petitioner was not entitled to a certificate of appealability,); *Walters v. Maschner*, 151 F. Supp. 2d 1068, 1076 (N.D. Iowa 2001) (holding that the petitioner had no clearly established right to the appointment of an expert to aid in jury selection; thus, the denial of such an expert did not warrant federal habeas relief). Further, the Sixth Circuit has noted that *Ake* "emphasized that its ruling was limited in cases in which the defendant's mental condition was seriously in question upon the defendant's threshhold showing." *See Smith v. Mitchell,* 348 F. 3d 177, 207 (6th Cir. 2003) (internal quotation marks omitted).

## C. Claims IV and VI: Prosecutorial-Misconduct Claims.

The Court discusses petitioner's fourth and sixth claims together for judicial clarity. In both claims, petitioner alleges he was denied a fair trial because of prosecutorial misconduct.

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)). A prosecutor's improper comments violate a criminal defendant's constitutional rights only if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). Prosecutorial misconduct forms the basis for habeas relief only if it was so egregious that, based on the totality of the circumstances, the entire trial fundamentally unfair. *Donnelly*, 416 U.S. at 645. A petitioner must show that the state court's rejection of his prosecutorial misconduct claim was so unjustifiable, "that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (quoting *Harrington*, 562 U.S. at 103).

Petitioner first contends that the prosecutor committed misconduct during *voir dire* by asking a juror a hypothetical question regarding how the juror would respond to the police if that juror was accused of a crime. Hypothetical questions during *voir dire* are permissible. *See Hunt v. Wolfenbarger,* No. 04-10046, 2007 WL 2421551, at *11–12 (E.D. Mich. Sept. 24, 2007). Nothing in the question suggested to the jurors that they should find petitioner guilty.

Petitioner next contends that the prosecutor committed misconduct by eliciting irrelevant evidence from several witnesses. But a prosecutor "does not commit misconduct by asking questions that elicit inadmissible evidence." *Key v. Rapelje,* 634 F. App'x 141, 148 (6th Cir. 2015). Moreover, as the Michigan Court of Appeals noted, all of the complained-of statements

were relevant to the prosecution's theory of the case or to rebutting petitioner's self-defense claim. *People v. Leachman*, 2015 WL 159942, at *8, 9. A prosecutor does not commit misconduct by asking witnesses relevant questions. *See Slagle v. Bagley,* 457 F.3d 501, 518 (6th Cir. 2006).

Petitioner next contends that the prosecutor committed misconduct by eliciting testimony about the 911 call. But 911 calls are generally admissible under the present-sense-impression exception to the hearsay rule. *See e.g. People v Hendrickson*, 459 Mich 229, 234–240; 586 N.W. 2d 906 (1998). And even if the 911 call was inadmissible, a prosecutor does not commit misconduct by eliciting inadmissible evidence. *Key,* 634 F. App'x at 148.

Petitioner next claims that the prosecutor committed misconduct when he asked the police whether petitioner mentioned certain things during the police interrogation. Petitioner claims that this was an impermissible reference to his right to remain silent. Here, however, petitioner did not exercise his right to remain silent, but spoke with the police. A defendant who voluntarily speaks after receiving *Miranda* warnings has not exercised his right to remain silent. *Anderson v. Charles,* 447 U.S. 404, 408 (1980). Thus, this claim is meritless.

Petitioner next claims that the prosecutor argued facts not in evidence when he told the jury that the air soft gun from the scene weighed between three and five pounds and could not have been hidden in the victim's clothing. It is improper for a prosecutor during closing arguments to bring to the jury any prejudicial facts not in evidence. *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000). However, prosecutors may argue reasonable inferences from the evidence. *Id.*

The Michigan Court of Appeals rejected petitioner's claim, stating that the air soft gun was "admitted as evidence at trial and each of the jurors were permitted to examine such evidence. As a result, information regarding the weight of the gun was in evidence, and Leachman has not shown that the prosecution's estimate regarding the weight of the gun was inaccurate."

*People v. Leachman*, 2015 WL 159942, at * 8. Here, the prosecutor's argument was factually supported by the record. Thus, it did not deprive petitioner of a fair trial.

Petitioner next argues that the prosecutor argued facts not in evidence when he mentioned that not all of the scene photographs were introduced at trial, and that while defense counsel could have admitted them, he did not. The prosecutor in this case did not argue any facts not in evidence. The prosecutor appeared to refer to the photographs only to rebut defense counsel's closing argument that the prosecution withheld these photographs. The prosecutor's clarification was not improper. *See e.g. United States v. Washam*, 468 F. App'x 568, 573–74 (6th Cir. 2012) (when viewed in context, there was nothing improper about a prosecutor's statement informing the jury that some evidence about the crime and defendant's past would not be admitted). In any event, the prosecutor's remarks were ameliorated by the trial court's instruction that the lawyers' comments were not evidence. May 22, 2013, Trial Tr. p. 5.

Petitioner further claims that the prosecutor argued facts not in evidence when he asked the following questions: (1) if Officer Brandon Talty knew whether the air soft gun was recovered from the scene because "somebody who is fearful of retaliation from Native Americans" carried and dropped it; (2) did Officer Jonathan Straus know how easy and quick it is to take apart an air soft gun; (3) if petitioner did not know where the gun was, did Officer Jeff Browne think that petitioner would expect the officer to find it; and (4) "Be it real [gun], toy, imaginary or, well, you wouldn't see an imaginary one, but fake?" The Michigan Court of Appeals reasonably rejected this claim, because the prosecutor's questions were all based on reasonable inferences arising from evidence already introduced at trial. *People v. Leachman*, 2015 WL 159942, at * 9.

Petitioner next claims that the prosecutor attempted to shift the burden of proof when, in his opening statement, he told the jury to consider the statements or lack of statements

from petitioner. Here, the comment did not deprive petitioner of a fair trial because any prejudice which might have resulted from it was cured by the trial court's instructions that petitioner was presumed innocent and that the prosecutor had the burden of proving his guilt beyond a reasonable doubt. May 22, 2013 Trial Tr. p. 4. *See Scott v. Elo,* 302 F.3d 598, 603-04 (6th Cir. 2002).

Petitioner next contends that the prosecutor committed misconduct by misstating the law regarding whether he had a duty to retreat and by suggesting that the apartment hallway was not part of the apartment's curtilage, thus imposing upon him a duty to retreat before using deadly force. Here, the prosecutor argued only that the hallway where the stabbing occurred was not a part of the apartment or its curtilage; he did not dispute that petitioner did not have a duty to retreat if he was in his home or the home's curtilage. The jury was free to reject this argument. Because the prosecutor did not misstate the duty-to-retreat law, his argument was not improper and, thus, petitioner is not entitled to relief on this claim. *See Palmer v. Bagley*, 330 F. App'x 92, 107 (6th Cir. 2009).

Petitioner next contends that the prosecutor committed misconduct by stating that if petitioner acted in self-defense, he would have been "justified in murdering" the victim. The prosecutor appears to have misspoken here and probably meant to say that if petitioner acted in self-defense, the killing would have been justified under the law.

Petitioner next claims that the prosecutor improperly opined on witness Joe Babosh's credibility. A prosecutor may not opine on witness credibility because vouching for the veracity of witnesses "improperly invit[es] the jurors to convict the defendant on a basis other than a neutral independent assessment of the record proof." *Caldwell v. Russell*, 181 F.3d 731, 737 (6th Cir. 1999). However, a prosecutor may argue that the jury should arrive at a particular conclusion given the record evidence. *Id.*

The Michigan Court of Appeals rejected petitioner's claim, stating:

> Here, the prosecution did not imply that it had special knowledge of Babosh's credibility. Rather, the prosecution asserted that based on the fact that Babosh was an uncooperative witness and his trial testimony conflicted in part with information that he provided to law enforcement, it is unclear whether his testimony was truthful. Therefore, there was no error.

*People v. Leachman*, 2015 WL 159942, at * 10.

The prosecutor's comments regarding Joe Babosh's truthfulness were based on the record, not the prosecutor's personal knowledge. Because they were based on the record, were only a small part of the prosecution's case, and did not create the impression that he knew of evidence outside the record, they did not deprive petitioner of a fair trial. *See Cristini v. McKee*, 526 F.3d 888, 902 (6th Cir. 2008).

Petitioner next claims that during the prosecutor's rebuttal, the prosecutor inappropriately went beyond the scope of defense counsel's closing argument and mentioned Levi Doolittle, even though defense counsel's closing had not mentioned Doolittle. A prosecutor's presentation of a new argument or new evidence during rebuttal is an error of state law which does not rise to the level of constitutional violation for purposes of seeking habeas corpus relief. *See Jenner v. Class,* 79 F.3d 736, 740 (8th Cir. 1996). Thus, petitioner is not entitled to relief here.

Petitioner lastly contends that the prosecutor's many errors cumulatively deprived him of a fair trial. The United States Supreme Court "has not held that distinct constitutional claims can be cumulated to grant habeas relief." *Lorraine v. Coyle,* 291 F.3d 416, 447 (6th Cir. 2002). Therefore, petitioner is not entitled to relief on his cumulative-errors claim.

### D.  Claims V and VII: Ineffective-Assistance Claims

The standard for obtaining habeas relief is "difficult to meet." *Metrish v. Lancaster*, 133 S. Ct. 1781, 1786 (2013). In the context of an ineffective-assistance-of-counsel claim, the

standard is "all the more difficult" because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential and when the two apply in tandem, review is doubly so." *Harrington*, 562 U.S. at 105 (internal citations and quotation marks omitted). To establish ineffective assistance of counsel, a petitioner must show both that counsel's performance was deficient—i.e., "that counsel's representation fell below an objective standard of reasonableness"—and that the deficient performance resulted in prejudice to the defense. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). Counsel is deficient if he "made errors so serious that [he] was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id.* There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" *Id*. at 689. Counsel's performance was prejudicial if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. "[T]he question is not whether counsel's actions were reasonable," but whether "there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

Petitioner first contends that counsel was ineffective for failing to object to the alleged prosecutorial misconduct mentioned in Claims IV and VI. Because the prosecutor did not commit misconduct, petitioner cannot establish that he was prejudiced by counsel's failure to object. *See Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001) (stating that "counsel cannot be ineffective for a failure to raise an issue that lacks merit").

Petitioner next claims that counsel was ineffective during his cross-examination of Chino Alaniz because he failed to show Alaniz pictures of the air soft gun found at the scene or question him about it. Petitioner claims that doing so would have corroborated his claim that the victim was armed with the air soft gun, so as to buttress his self-defense claim.

The Michigan Court of Appeals rejected petitioner's claim, stating:

Leachman argues that trial counsel ineffectively cross-examined Alaniz when he failed to show him and question him regarding pictures of the air soft gun found at the scene. Leachman claims that if Alaniz had seen the pictures of the gun and testified that it was similar to Stanley's, then it would have corroborated Leachman's statement that Stanley had a gun on the day of the incident. The presence of the air soft gun in general, however, corroborated Leachman's statement. Additionally, Leachman has not demonstrated how Alaniz possibly identifying the gun as one similar to Stanley's, while also testifying that he did not see Stanley with a gun the day of the incident, would have resulted in his acquittal.

*People v. Leachman*, 2015 WL 159942, at * 10. "Courts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel" because it "is a matter of trial tactics." *Dell v. Straub*, 194 F. Supp. 2d 629, 651 (E.D. Mich. 2002).

Here, Alaniz did not see the victim with the air soft gun on the night in question. Consequently, counsel's choice to not cross-examine him about the air soft gun was a tactical decision well within the wide range of reasonable professional assistance. Additionally, the jury already had evidence that an air soft gun had been recovered from the crime scene. Petitioner fails to explain how further impeaching Alaniz would have affected the jury's decision. Defense counsel was not ineffective for failing to cross-examine Alaniz about the air soft gun.

Relatedly, petitioner argues that counsel was ineffective for failing to introduce into evidence an intact model of an air soft gun like the one from the scene. He claims that the jury could have determined the weight of the air soft gun to see that such a weapon was light enough for the victim to carry in his pants. But as the jury had the actual air soft gun from the scene, petitioner fails to show how a model would have helped his defense.

Petitioner next claims that counsel was ineffective for failing to recall Lieutenant Scott Hrcka to testify that Detective Sytsema was not as knowledgeable about fingerprinting as he claimed.

Lieutenant Hrcka testified that he helped the Mount Pleasant Police with a latent-print analysis of the recovered knife and an entrance door to the building. May 17, 2013 Trial Tr. p. 120. He testified about a chemical agent used for fingerprinting and indicated that there are many reasons fingerprints might not be recovered from an item, including the item's temperature whether the object was touched numerous times, or whether the person touching the item was sweating. *Id.* at 129. If the item is cold and the person not sweating, he may not leave fingerprints. *Id*. at 134–35. He said that analysis use many different fingerprinting methods depending on the item's surface type; it is critical to know how absorbent an item or how water interacts with it because a fingerprint is 97–98% water. He explained that since the knife here was metal and plastic, he used super glue fuming to make an invisible fingerprints visible; he then used black fingerprint powder to contrast with the knife's cream and silver color. He did not use other techniques because they destroy DNA. *Id*. at 132–33.

Counsel asked Detective Sytsema why he waited over a month after the incident to fingerprint the air soft gun. May 21, 2013, Trial Tr. p. 106. Counsel specifically referenced Lieutenant Hrcka's testimony about different fingerprinting methods, asking him whether he used all three methods. Detective Sytsema responded that he only dusted the air soft gun with powder. *Id.* at 106–07. Counsel could have reasonably determined that Lieutenant Hrcka's testimony was still fresh in the jurors' minds. Thus, he was not deficient in failing to recall Lieutenant Hrcka to testify after Detective Sytsema had testified.

Petitioner next claims that defense counsel should have asked Officer Hawks, Officer Talty, and Hinojosa additional questions on cross-examination. First, counsel should have asked Hinojosa about his statement to the police that petitioner's fat friend hit Hinojosa on the night in question. Petitioner believes that this friend was Harner. Petitioner also indicates that

counsel should have questioned Officer Hawks about Hinojosa's statement that petitioner's knife was black-handled, when Hinojosa said at trial that he never saw the stabbing. Petitioner also claims that counsel should have questioned Officer Talty about a statement Hinojosa gave in which he stated that petitioner came up behind the victim and asked him if he was going to snitch; petitioner believes that this conflicts with Hinojosa's trial testimony that petitioner was behind a closed door when he said this. Petitioner fails to identify how bringing out any of these alleged inconsistencies would have assisted his defense. Defense counsel did not perform ineffectively by not cross-examining these witnesses about these subjects when petitioner only speculates as to the purported benefits of further questioning.

Petitioner next claims that counsel was ineffective for failing to get a psychologist as an expert witness, when the state court gave counsel extra time to do so at the court's expense. A petitioner's claim that counsel was ineffective for failing to call an expert witness cannot be based on speculation. *Keith v. Mitchell,* 455 F. 3d 662, 672 (6th Cir. 2006). Petitioner has not shown that his suggested testimony would have supported his self-defense claim. Further, the jury could understand petitioner's self-defense claim without expert testimony. Because petitioner fails to show that counsel's failure to obtain an expert on the self-defense issue prejudiced him, he is not entitled to habeas relief. *Langford v. Butler,* 55 F. App'x 462, 463 (9th Cir. 2003).

Petitioner next claims that counsel was ineffective for failing to object the admission of Exhibit 104, but he fails to explain why this exhibit was inadmissible.

Finally, petitioner argues that he deserves a new trial because at the hearing on his motion for a new trial, his counsel admitted to being ineffective. The Supreme Court has thoroughly explained why this Court cannot use counsel's own subjective belief in his own ineffectiveness as a basis to grant relief:

> After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome. *Strickland*, however, calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind.

*Harrington*, 562 U.S. at 109–10. Several circuit courts later echoed the Court's reasoning.[21]

Consequently, petitioner is not entitled to relief on his ineffective-assistance-of-counsel claims.

## IV.   CONCLUSION

Accordingly,

IT IS ORDERED that the Court's December 14, 2017, opinion and order and judgment are vacated.

IT IS ORDERED that the petition for a writ of habeas corpus is denied.

IT IS FURTHER ORDERED that a certificate of appealability is denied because petitioner has failed to make a substantial showing of the denial of a federal constitutional right, 28 U.S.C. § 2253(c)(2), and leave to appeal *in forma pauperis* is denied because the appeal would be frivolous, 28 U.S.C. § 1915(a)(3).

Dated: January 22, 2018          s/Bernard A. Friedman
      Detroit, Michigan          BERNARD A. FRIEDMAN
                                 SENIOR UNITED STATES DISTRICT JUDGE

---

[21] *See, e.g.*, *Harris v. United States*, 367 F.3d 74, 81 (2d Cir. 2004) ("[S]ome excellent lawyers would stipulate to their own ineffectiveness if it might help win a client's release."); *Dugas v. Coplan*, 428 F.3d 317, 328, n.10 (1st Cir. 2005) ("[Counsel's] subjective impression that his representation was inadequate plays no role in our decision."); *Jennings v. McDonough*, 490 F.3d 1230, 1247 (11th Cir. 2007) ("The *Strickland* standard of objective reasonableness does not depend on the subjective intentions of the attorney. . . or an attorney's admission of deficient performance").

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 22, 2018.

s/Johnetta M. Curry-Williams
Case Manager